We therefore reverse and remand for further hearings in conformity with this opinion.

**UNITED STATES of America, Appellee,**

v.

**Paul MANNINO, Defendant–Appellant.**

**No. 167, Docket 80–1206.**

United States Court of Appeals, Second Circuit.

Argued Sept. 9, 1980.

Decided Nov. 18, 1980.

Stuart J. Baskin, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty., S. D. N. Y., Gregory L. Diskant, Asst. U. S. Atty., New York City, of counsel), for appellee.

Graham Hughes, New York City (Gerald L. Shargel, New York City, of counsel), for defendant–appellant.

Before FEINBERG, Chief Judge, and FRIENDLY and OAKES, Circuit Judges.

FEINBERG, Chief Judge:

Paul Mannino appeals his conviction, following a jury trial before Judge Robert W. Sweet in the United States District Court for the Southern District of New York, on an indictment charging several violations of federal drug, firearm, and racketeering laws. Mannino's principal contention is that critical evidence against him was obtained by means of an unconstitutional search and should therefore not have been admitted at trial. He also argues that the evidence was insufficient to sustain his conviction under 21 U.S.C. § 848 for engaging in a continuing criminal enterprise, or for conducting an enterprise affecting interstate commerce through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). In this latter connection, Mannino also challenges the order of forfeiture of his residence as property acquired or maintained in violation of the racketeering laws.

For reasons set out below, we affirm.

### I

In July 1979, undercover agents of the federal Drug Enforcement Administration (DEA) negotiated the first of a series of purchases of methaqualone tablets (Quaaludes) from a Brooklyn–based dealer named Joseph Cordano. In September, Cordano told one of the agents that his source, whom he identified as "Paulie," was willing to sell some 70,000 pills, but only if delivery took place in Brooklyn. The agent urged that delivery be made to him at a hotel, but Cordano indicated that he would have to discuss the request with "Paulie." A few days later, the agent called Cordano to set up the deal. Cordano said he was going to "Paulie's" house; surveillance agents following him ascertained that his destination

was the residence of Paul Mannino. While Cordano was there he spoke again by telephone with the agent, telling him that he could deliver only 10,000 pills and that the delivery would have to be at Cordano's residence. The agent tried to persuade him to change the terms; Cordano could be heard relaying the agent's requests to "Paulie," who in turn could be heard instructing Cordano what to say. In the end the agent gave in, accepting the terms given. When Cordano later arrived at his residence with the pills, he was arrested.

Shortly thereafter, DEA agents watching Mannino's residence observed him and another person load several large boxes into the rear of a station wagon that had been backed into the driveway. When the two began to drive away, the agents blocked the car's path and arrested them. Immediately thereafter, the agents opened one of the boxes, discovering that it contained a large quantity of Quaaludes. Mannino was then taken into the house, assertedly at his own request to escape the scrutiny of gathering neighbors. Once inside, the agents conducted a cursory search of the house, in the course of which they seized a loaded, sawed-off shotgun.

Returning to the station wagon some fifteen minutes later, one of the agents observed a white plastic bag on the front seat. According to the testimony of the agent at a pretrial hearing on a motion to suppress, the bag was open and a "Composition"

brand notebook protruded from the top. Mannino, however, asserted that the notebook was within a folded-over brown paper bag inside the plastic bag, and that the plastic bag was itself folded shut.[1] The agent removed the notebook from the bag and "leafed through" it closely enough to recognize that it contained an extensive and detailed record of drug sales and purchases.[2] He also lifted out the paper bag and realized, upon feeling the shape and weight of its contents, that it contained guns. When he opened the bag, he found three loaded handguns and an air pistol.

The next day, the agents returned to the house with a search warrant and seized a number of objects later used at trial, including shotgun shells, telephone and address books, and $45,675 in cash.

Mannino was indicted in February 1980, together with Cordano and three others who had allegedly been involved in illegal activities with Mannino. The indictment charged Mannino[3] with conspiracy to violate federal drug laws, in violation of 21 U.S.C. § 846; engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848; four separate counts of distributing or possession Quaaludes, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2; various firearm violations; and conducting, through a pattern of racketeering activity, an enterprise whose activities affect interstate commerce, in violation of the Racketeer-Influenced and Corrupt Or-

1. In his decision at the end of the suppression hearing, Judge Sweet chose not to resolve the conflict in the testimony on this point.

2. The entries in the notebook cover some sixty pages. Most date from 1978 and 1979, but some are earlier, including one page apparently recording debts incurred on Dec. 27, 1975. The first section of the book contains a detailed inventory of "merchandise received," ranging from "1 oz charlie" for $1,500 to "1 lb speed" for $6,000. Many of the entries list deliveries of "bootleg," referring to Quaalude tablets, recorded generally at $1 per pill or $1,100 per 1,000.

Nearly two dozen pages carry the accounts of individual purchasers, many of whom appear to have had running lines of credit over an extended period. Mannino's list included such customers as Mousie, Zumbo, Zig, Gallo, Jim-

mie, Warren, Lance, Ross, Mickie, Steven, Sally, Joey, Chris, George, Babe, Dee, Rob, Long Is[land] Mike, Author, Rosann, Pattie, Muga, Tony, Carlo, Miriam, and a mysterious X.

A two-page section records a series of "loans" made to several persons on what appears to have been a regular weekly basis during most of 1979.

Finally, the last pages record "favors" and "expensis," the latter including entries for calculators, bullets, and rent, as well as such items as $105 for "vest (bullet proof)," $5,157.94 for "house in Atlantic City (took out 4000 mortgage)," and $3,000 for "me and Neil for Vegas."

3. The counts brought against Mannino's codefendants differed in some respects not important to this case.

ganizations (RICO) Act, 18 U.S.C. § 1962(c). The jury convicted Mannino on all counts. He was sentenced to a term of seventeen and one–half years on the continuing criminal enterprise conviction; twelve and one–half years on the RICO conviction and ten years on the firearms convictions, both terms to run concurrently with the first sentence; and five years on each of the drug distribution convictions, to run concurrently with each other but subsequent to the RICO term, and to be followed by a special parole term of ten years. In addition, pursuant to a special verdict the court ordered the forfeiture to the United States of Mannino's residence, which the indictment had alleged to be forfeitable under both the continuing criminal enterprise and RICO statutes.

## II

Mannino moved prior to trial for the suppression of evidence seized without a warrant from the house and station wagon, including the boxes of drugs and the contents of the plastic bag. In a careful opinion following a hearing, Judge Sweet granted the motion with respect to some of the boxes and certain other evidence, but denied it with respect to the notebook and guns found in the plastic bag. D.C., 487 F.Supp. 508. The court reasoned that the search of the bag was justified because it was unsealed and in plain view on the front seat of the car, because the defendant had no reasonable expectation of privacy in it, and because the agents had probable cause to search it in light of the discovery of the shotgun in the house.

Mannino challenges the correctness of this conclusion under the standards set forth in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). In *Chadwick*, the Court held unconstitutional the warrantless search of a double–locked footlocker seized from the trunk of defendant's automobile. In *Sanders*, the Court reached the same conclusion regarding an unlocked suitcase taken from the trunk of a taxi. In each of these cases, as in the present one, the police had ample and reasonable cause to suspect that the objects searched held evidence of crime; the issue was whether, given the existence of probable cause, the search of such personal luggage was permissible in the absence of a warrant. Specifically, the Court considered whether a search might be predicated on the "automobile exception" to the warrant requirement, established by *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). However, the Court did not purport to decide whether and in what circumstances other recognized exceptions, such as "special exigencies," might apply to luggage searches.[4]

The critical inquiry under *Chadwick* and *Sanders* is the extent to which the object searched is protected by its owner's "reasonable expectation of privacy." An object in which the owner lacks any such expectation may be searched on the basis of probable cause when it comes lawfully into the possession of the police. On the other hand, when the object is one entitled to independent privacy protection, a warrantless search is permissible only when one of the recognized exceptions is applicable. Determining when an expectation of privacy does or does not exist is "in a sense . . . a line–drawing process," but one that "must be guided by established principles." *Arkansas v. Sanders, supra*, 442 U.S. at 757, 99 S.Ct. at 2589.

---

4. In *Chadwick*, for example, the Court recognized the established exception permitting a prompt, warrantless " 'search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' " 433 U.S. at 14, 97 S.Ct. at 2485, quoting *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040,

23 L.Ed.2d 685 (1969). See also 433 U.S. at 10 n.5, 97 S.Ct. at 2482 n.5 (exception for "non-criminal inventory searches"); id. at 15 n.9, 97 S.Ct. at 2485 n.9 (exception for luggage believed to contain an immediately dangerous instrumentality); *Arkansas v. Sanders, supra*, 442 U.S. at 763–64 n.11, 99 S.Ct. at 2593 n.11 ("special exigencies").

In finding that the footlocker in *Chadwick* and the suitcase in *Sanders* were protected from warrantless search, the Supreme Court attached special importance to their "fundamental character as a repository for personal, private effects." *Arkansas v. Sanders, supra,* 442 U.S. at 762–63 n.9, 99 S.Ct. at 2592 n.9. The owners of such a "repository" had a reasonable expectation that the privacy of its contents would be respected. Decisions in a number of courts have reached the same conclusion with respect to a wide variety of containers that more or less closely resemble traditional forms of "luggage," ranging from purses and wallets to a guitar case. See, e. g., the cases catalogued in *United States v. Ross,* No. 79–1624, slip op. at 9 n.3 (D.C.Cir. 1980), vacated and rehearing en banc granted (June 26, 1980); cf. id. n.4. This court has gone a step further in recognizing a protected expectation of privacy in a securely taped cardboard box secreted in the back of a van whose windows had been painted over. *United States v. Dien,* 609 F.2d 1038, 1044–45 (2d Cir. 1979), adhered to on rehearing, 615 F.2d 10 (2d Cir. 1980). Cf. *Cooper v. Commonwealth,* 577 S.W.2d 34 (Ky.App.1979) (permitting warrantless search of taped electric razor case).

■ But not all containers that happen to carry personal effects are immune from warrantless search: there must be some objective, external evidence of an expectation of privacy. In *Sanders* itself, the Court was concerned with a form of "luggage . . . *inevitably* associated with the expectation of privacy," 442 U.S. at 762, 99 S.Ct. at 2592 (emphasis added). Containers not "inevitably" used for the transport or safeguarding of personal effects may present closer questions. In some cases, as *Sanders* suggested, it may be clear from surface inspection that no warrant is required:

[S]ome containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant.

Id. at 764–65 n.13, 99 S.Ct. at 2593 n.13. In other cases, the owner may have signalled an expectation of privacy by taking special precautions to secure and secrete the contents of a container, as in *United States v. Dien, supra.*

■ The plastic bag found on the front seat of Mannino's car plainly could not, by itself, be regarded as a form of "luggage." Nor did any of the surrounding circumstances suggest that the bag was meant to serve as a repository of private effects. Like the "closed but unsealed" paper bag in *United States v. Ross, supra,* at ——, an unsecured plastic bag of the kind involved here

offer[s] at best only minimal protection against accidental and deliberate intrusions. [It] can fall open or break very easily. It presents no real obstacles to invasions by the curious or the dishonest once it has left its owner's actual possession. Because it is neither so secure nor so permanent as typical forms of luggage, its contents are much more likely to become subject to public display than if the same items had been stored in luggage.

Accord, *United States v. Goshorn,* 628 F.2d 697 (1st Cir. 1980); *United States v. Mackey,* 626 F.2d 684, 687–88 (9th Cir. 1980). Thus, we believe that the bag was not protected by an independent privacy interest.[5] It was, instead, subject to the general rule permitting warrantless searches of "containers [found in a lawfully seized car] which police have probable cause to believe may contain evidence of the crime which justifies the search." *United States v.*

---

**5.** Mannino argues on appeal that his asserted efforts to secure the bags' contents by folding them closed, see note 1 and accompanying text *supra,* were sufficient to endow them with an expectation of privacy. But even if these efforts were undertaken, they do not rise to the level necessary to evidence an expectation of privacy protected under the Fourth Amendment.

*Ochs,* 595 F.2d 1247, 1254 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

Mannino makes much of an asserted lack of urgency in the search of the station wagon. With the car effectively immobilized in the driveway, the keys in the hands of the DEA agents, and Mannino and his colleagues in the house and in handcuffs, he argues, there were no exigent circumstances justifying a search without the few hours' wait that would have been necessary to procure a warrant. We are not, however, persuaded that the situation was so neatly in hand. The evidence indicates that a crowd was gathering, and agents watching the house had seen other associates of Mannino entering and leaving during the course of the day. The agents may reasonably have been concerned that others involved in the affair might be present and pose a threat to the security of the car and its prominently visible contents.

■ But we need not make a final determination of the exigency of the situation since the search of the car and the seizure of the bag was permissible under the automobile exception to the warrant requirement even assuming that the car and its contents were no longer mobile. See *United States v. Mackey, supra,* 626 F.2d at 685–86. The reduced expectation of privacy that attaches to automobiles was sufficient to empower the police lawfully to conduct a warrantless search of the car and to seize the plastic bag in plain view on the front seat. See *Chadwick, supra,* 433 U.S. at 12, 97 S.Ct. at 2484; *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974) (plurality opinion); *Cady v. Dombrowski,* 413 U.S. 433, 441–42, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). In view of our conclusion that the bag and its contents were not protected by an independent expectation of privacy, it was not necessary for the government to justify the further step of opening and searching the bag by showing either an extra measure of need for the search of the bag or the applicability of any other specific exception to the warrant requirement, such as the exception for searches of the area within the "immediate control" of the arrested person, see *Chimel v. California, supra,* 395 U.S. at 763, 89 S.Ct. at 2040.

■ As a separate point, Mannino argues that even if his notebook was lawfully seized, the agent who took it acted unconstitutionally in opening and perusing it. This contention cannot withstand close scrutiny. The notebook, an ordinary "Composition" book with a familiar mottled cover, bore no surface indications suggesting either that it contained intimate personal material on the one hand or a catalogue of "Robberies I Have Performed" on the other, see *United States v. Bennett,* 409 F.2d 888, 897 (2d Cir.), *cert. denied,* 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969)–though in view of its location it resembled the latter more closely than the former.[6] Under all the circumstances, opening such a book to ascertain its contents and possible evidentiary value was not improper. Ample case authority sanctions "some perusal, generally fairly brief, of ... documents [seized during an otherwise valid search] ... in order for the police to perceive the relevance of the documents to crime." *United States v. Ochs, supra,* 595 F.2d at 1257 n.8. See also *United States v. Callabrass,* 607 F.2d 559, 564 (2d Cir. 1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980). In this case, of course, that relevance was immediately apparent upon the opening of the notebook; see note 2 *supra.*

■ Mannino also contends that the notebook was subject to Fifth Amendment protection, on the ground that it contained self–incriminating "testimony." We do not agree that the contents of the notebook were privileged. In *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627

---

**6.** We do not find significant Mannino's occasional insertion of arguably "personal" expenditures, such as the entry of [$]35–Karen [Mannino's wife] [for] Exp for house" and "[$]350– Ski House." These entries, appearing on four pages of the 60–page notebook, fall far short of converting the book from a business record into a personal paper.

(1976), the Supreme Court held that business records of an attorney, obtained pursuant to a search under a proper warrant, were admissible against him at trial, largely on the basis that their admission would not constitute "compulsion" of self–incriminating testimony. The Court's reasoning in that case is applicable virtually in its entirety to the present facts. In *Andresen*, as in this case,

> petitioner was not asked to say or to do anything. The records seized contained statements that petitioner had voluntarily committed to writing. The search for and seizure of these records were conducted by law enforcement personnel. Finally, when these records were introduced at trial, they were authenticated by a handwriting expert, not by petitioner. Any compulsion of petitioner to speak, other than the inherent psychological pressure to respond at trial to unfavorable evidence, was not present.

*Id.* at 473, 96 S.Ct. at 2745.[7] Indeed, the only significant departure here from *Andresen* is that the notebook was not seized under a warrant. We acknowledged in *United States v. Ochs, supra*, 595 F.2d at 1259, that *Andresen* had not resolved the question in the context of warrantless searches; we found it unnecessary to do so in *Ochs* as well. But this case presents the issue squarely, and we conclude that the manner in which the notebook came into the hands of the authorities, so long as it was lawful, does not affect the Fifth Amendment analysis of its admissibility. Since we have found the seizure of the notebook lawful, we thus conclude that its admission into evidence did not involve unconstitutional compulsion. See also *Fisher v. United States*, 425 U.S. 391, 409, 96 S.Ct. 1569, 1580, 48 L.Ed.2d 39 (1976) (self–incrimination "privilege protects a person only against being incriminated by his own compelled testimonial communications").

### III

Mannino next challenges the sufficiency of the evidence underlying his conviction for engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848.

Section 848 imposes criminal liability on any person who commits a specified drug–related violation punishable as a felony, when:

> . . . such violation is a part of a continuing series of violations of [the specified statutory provisions]–
>
> (A) which are undertaken by such person in concert with five or more persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
>
> (B) from which such person obtains substantial income or resources.

Conceding that he engaged in a "continuous series of violations" within the sense of the statute, Mannino asserts that there was inadequate proof that he acted as an organizer, supervisor, or manager, or that he did so with respect to five or more persons. In essence, Mannino seeks to depict himself as merely a successful "solo practitioner," a middleman who dealt on an equal footing with other independent entrepreneurs and participated in occasional "joint ventures" with "partners." He argues that these activities do not reveal the central direction and hierarchical organization assertedly contemplated by the statute.

■ We note at the outset that the language of the statute is disjunctive: the government's burden is only to show that Mannino organized, supervised, *or* managed at least five other persons. See *United States v. Jeffers*, 532 F.2d 1101, 1115–16 n.17 (7th Cir. 1976), *aff'd*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). It is not essential that such relationships have existed at the same moment in time, see *United States v. Barnes*, 604 F.2d 121, 157 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Sperling*, 506 F.2d 1323, 1344 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). By the same

---

**7.** In this case, a government expert testified that the notebook was in Mannino's handwriting; the defense made no effort to challenge the identification on cross–examination.

token, the language of the statute does not suggest that the same type of superior–subordinate relationship must have existed with each of the other persons involved.

The operative concepts used in section 848–"organize," "supervise," and "manage"–are not technical, and we see no reason to give them other than their everyday meanings. See *United States v. Valenzuela*, 596 F.2d 1361, 1367–68 (9th Cir.), *cert. denied*, 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979). It is true that cases involving well–defined chains of command under the control of a "King Pin," see, e. g., *United States v. Johnson*, 575 F.2d 1347, 1358 (5th Cir. 1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213, 1214, 59 L.Ed.2d 454 (1979), offer the clearest examples of organization, supervision, or management, but the necessary showing can plainly be made in the case of a less structured enterprise. In this case, Mannino's very success as a middleman with a vast network of purchasers and sources of immense supply, see note 2 *supra*, reveals his essential function as an organizer, supervisor, or manager.

■ But at a more specific level, there was ample evidence to establish individual relations of control with at least five persons. The first of these was Cordano; the evidence showed that Mannino alone set the terms for Cordano's sale, including the quantity and place of delivery, and that Cordano had no latitude to vary Mannino's instructions. The evidence also showed that Mannino "organized" the trip of two couriers, Joey and Lance–Mannino's so-called partners–to Florida for a large drug pickup in 1975; Mannino provided the money for the trip, gave the couriers coded instructions for the pickup, and arranged to assemble the recipients for distribution of the drugs upon their delivery to New York. Next, Mannino's notebook recorded a payment of "[$]10,000 for work" to "Muga,"

the person assisting Mannino at the time of his arrest, indicating the existence of a relationship that even Mannino concedes satisfies the statutory requirement. Finally, the evidence also showed that Mannino's brother "Zig" had acted on his behalf in collecting debts from a purchaser named Rob. Thus, viewing the evidence in its entirety rather than by minute dissection, the jury was entitled to conclude that Mannino organized, supervised, or managed a large drug ring involving at least five persons.

IV

■ Mannino also contends that the activities for which he was indicted do not amount to an offense under the RICO statute, 18 U.S.C. § 1962(c), which declares that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Mannino argues, first, that the statute does not apply to illegal enterprises such as a drug ring. However, as Mannino concedes, this precise question has been settled for this Circuit by *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977), which held squarely that the statute applies to "*any* enterprise," as its language reads, whether or not legitimate. We are aware that the circuits are split on this question, some agreeing with us [8] and others limiting the statute to legitimate enterprises.[9] We recognize that the issue will ultimately have to be decided by the Supreme Court, but we see no reason to de-

---

**8.** See, e. g., *United States v. Rone*, 598 F.2d 564 (9th Cir.), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976); *United States v. Cappetto*, 502 F.2d 1351 (7th Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975).

**9.** See *United States v. Turkette*, 632 F.2d 896 (1st Cir. 1980); *United States v. Anderson*, 626 F.2d 1358 (8th Cir. 1980); *United States v. Sutton*, 605 F.2d 260 (6th Cir. 1979), petition for rehearing en banc granted (1979).

part at this point from our own prior decision.

■ Mannino's second argument with respect to the RICO conviction is that the government failed to establish the statute's jurisdictional predicate by showing his association with an "enterprise engaged in, or the activities of which affect, interstate or foreign commerce." In particular, he faults the court's instruction permitting the jury to find that Mannino's purchase of a house in Atlantic City, New Jersey, constituted an activity by an enterprise affecting interstate commerce. This instruction was not erroneous, especially in view of Judge Sweet's express qualification to the instruction permitting such a finding only "if you find that the purchase was connected directly or indirectly with the illegal enterprise, and that there is a connection, a nexus between the activities of the enterprise and the purchase of the property in Atlantic City." Moreover, our conclusion that no error was committed here is strengthened by the presence of ample other evidence of interstate effects, e. g., the dispatch of couriers to Florida to pick up the drug shipment, which established a strong basis for the necessary jurisdictional finding.

■ Finally, Mannino argues that the court erred in instructing the jury that the United States was entitled to forfeiture of Mannino's Brooklyn residence under 18 U.S.C. § 1963(a), the RICO section providing for forfeiture of "any interest . . . acquired or maintained in violation of section 1962," if the jury found that the house formed part of Mannino's racketeer–influenced enterprise. However, the judge also instructed the jury to return a special verdict finding the United States entitled to forfeiture under 21 U.S.C. § 848, if the jury found the house to have been purchased with proceeds of the continuing criminal enterprise. The jury found the residence forfeitable under both statutes and Mannino concedes the propriety of the charge under § 848. In view of our conclusion that his conviction under that statute should be

affirmed, we need not reach the RICO forfeiture issue.

The judgment of conviction is affirmed.