**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Alfred Lee APODACA, Defendant–Appellant.**

No. 86–1366.

United States Court of Appeals, Tenth Circuit.

April 1, 1988.

As Amended June 24, 1988.

Order on Denial of Rehearing June 24, 1988.

Robert Justin Driscoll, Denver, Colo., for defendant-appellant.

Richard A. Stacy, U.S. Atty. (David A. Kern, Asst. U.S. Atty., with him on the brief), Cheyenne, Wyo., for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, SEYMOUR, Circuit Judge, and SAFFELS *, District Judge.

SEYMOUR, Circuit Judge.

Alfred Lee Apodaca was convicted of engaging in a continuing criminal enterprise (CCE), in violation of 21 U.S.C. § 848 (1982); use of a communication facility in connection with the commission of a felony, in violation of 21 U.S.C. § 843(b) (1982); and unlawful possession of a firearm, in violation of 18 U.S.C.App. § 1202(a)(1) (1982). With respect to the continuing criminal enterprise conviction, Apodaca argues that (1) the evidence was insufficient to support a jury finding that he organized, supervised, or managed five or more persons, and (2) the court committed reversible error by allowing the Government to introduce evidence of predicate offenses not specifically alleged in the indictment. Apodaca also argues that the trial court abused its discretion and abridged his right to a fair trial by permitting the marshal to secure his legs with a leg chain during the trial. We affirm.

* Honorable Dale E. Saffels, District Judge, Dis-

## I.

The Government's proof at trial showed that from at least 1982 until February 1985, Apodaca was the central figure in organizing numerous individuals to manufacture and distribute methamphetamine (crank) in central Wyoming. Nick Manzanares, one of Apodaca's immediate subordinates, testified that in 1982 he began selling methamphetamine for Apodaca. When Apodaca moved to Cody, Manzanares "more or less took up the position that [Apodaca] had occupied there in Riverton—took over the business," rec., vol. VI, at 381, and sold a supply of crank that Apodaca had left with him on a consignment basis. Ron Jackson testified that he began selling crank for Apodaca early in 1983 in Casper. Jackson stated that sometimes he dealt with Apodaca personally, while at other times transactions were handled through Manzanares or Dennis Beckers, Apodaca's stepfather.

In late 1983 or early 1984, Apodaca, George Williamson, and Donald Settegast manufactured methamphetamine at Apodaca's residence in Riverton. Manzanares testified that he received and sold some of the crank from this "cook" (cook I), and gave the proceeds from the sales to Apodaca.

In June 1984, another "cook" (cook II) took place between Riverton and Shoshoni. Apodaca and Manzanares assisted Williamson, who acted as the chemist or "chef." After cook II was completed, Apodaca and Manzanares packed up the laboratory, which Manzanares stored at Apodaca's instruction. Apodaca gave portions of the cook II supply to Manzanares, who distributed it to Susan Harsch, Tim Richards, and Ron Jackson, who were dealing in Casper, and to Mike Pasely, who was dealing in Riverton and Thermopolis. Harsch paid Manzanares the proceeds from her sales, he retained his own share, and "[m]ost of [the money] went back to [Apodaca]." Rec., vol. VI, at 395–96. Manzanares testified that Jackson and Pasely were both dealers working for Apodaca.

Manzanares also testified that Apodaca had offered to pay for a lawyer if Manzanares were ever arrested. Rec., vol. VI, at 398. Apodaca instructed Manzanares to pass on the information. Manzanares conveyed Apodaca's offer to Harsch, Richards, and Ron and Barbara Hale, all dealers who

trict of Kansas, sitting by designation.

received their supply of methamphetamine from Apodaca through Manzanares.

In mid-August 1984, the supply of crank from cook II was depleted. Apodaca instructed Manzanares and Beckers to transport the lab from Wyoming to Oregon for another "cook" (cook III). In Oregon, Williamson, Apodaca, and Manzanares produced approximately eighteen pounds of methamphetamine. Manzanares and Apodaca then packed up the lab and stored it in a rental storage facility in Grants Pass, Oregon. Apodaca signed the storage contract. After cook III, he and Manzanares travelled to San Francisco. At Apodaca's direction, Jackson flew to San Francisco to pick up some of the cook III crank to take back to Wyoming. Manzanares flew back to Casper with about a pound of crank. Harsch picked him up at the Casper airport and took him to her trailer house, where he distributed a few ounces of crank to Harsch and Richards. Ron and Barbara Hale, who were dealing in Riverton and whom Manzanares had called from California, met him at Harsch's house and drove him back to Riverton. The Hales initially received about an ounce of the cook III crank. Manzanares eventually distributed the remainder of the pound to Harsch, Richards, and the Hales.

The evidence suggests that Apodaca remained on the West Coast while the first portions of the cook III crank were being sold on the street in Wyoming. When he returned, he brought back five more pounds of methamphetamine, which he gave to Manzanares for distribution. Later, after Apodaca was arrested and incarcerated, Manzanares continued to distribute the five pounds to Donald Settegast, Linda Williamson, Ron Jackson, Louis Montoya, and Dave Blumgren, on instructions from Dennis Beckers. Beckers received the sales proceeds on Apodaca's behalf and at Apodaca's direction.

Susan Harsch testified that in October 1984, Manzanares introduced her to Apodaca. Harsch stated that while the three of them were together, she said to Manzanares, "So, this is your boss?" Rec., vol. VII, at 596. Manzanares "agreed," and Apodaca "kind of made a little sound and nodded his head." *Id.* Later, Harsch said to Apodaca, "I am glad that you finally told me, because I have known for over a year that [you are] the boss, or head man."

Apodaca "just kind of laughed and said, 'Yeah.'" *Id.* at 597.

In January 1985, Apodaca was arrested and incarcerated. Randy Britt, who first met Apodaca when the two were imprisoned in the county jail, testified that Apodaca told him that "Barb and her husband" had been selling for him. Rec., vol. VII, at 617. Apodaca also told Britt that "when he got out of prison, he was going to get everybody going again." *Id.* at 619.

## II.

Apodaca does not dispute that the facts summarized above clearly establish his deep involvement with numerous individuals in the manufacture and distribution of methamphetamine. Instead, he contends that the evidence was insufficient to permit the jury to find that he occupied a position of organizer, supervisor, or manager with respect to five or more persons, as required by 21 U.S.C. § 848(b)(2)(A). Apodaca concedes that the requisite relationship existed between himself and three people—Manzanares, Beckers, and Jackson. After reviewing the record, we conclude that the jury properly could have found beyond a reasonable doubt that he occupied the position of organizer, supervisor, or manager with respect to at least four other individuals.

In reviewing a claim that the evidence is insufficient to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see United States v. Dickey*, 736 F.2d 571, 587 (10th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985).

To be convicted of engaging in a continuing criminal enterprise, a defendant must have acted "in concert with five or more persons with respect to whom [the defendant] occupies a position of organizer, a supervisory position, or any other position of management." 21 U.S.C. § 848(b)(2)(A). In *Dickey*, we noted that " '[t]he operative concepts used in section 848—"organize," "supervise," and "manage"—are not technical, and we see no reason to give them

other than their everyday meanings.'" *Dickey,* 736 F.2d at 587 (quoting *United States v. Mannino,* 635 F.2d 110, 117 (2d Cir.1980)); *accord United States v. Oberski,* 734 F.2d 1030, 1032 (5th Cir.1984); *United States v. Ray,* 731 F.2d 1361, 1367 (9th Cir.1984).

■ Significantly, the statute is phrased in the disjunctive. The defendant must have acted as organizer, as supervisor, *or* in any other position of management. The use of the phrase, "any *other* position of management," indicates that "organizer" and "supervisor" are but two examples of managerial roles; there may be others. Additionally, "organizer" and "supervisor," understood according to their ordinary meanings, can denote differing levels of managerial control and coordination. *See Oberski,* 734 F.2d at 1032 n. 3. "In ordinary parlance, a relationship of supervision is created when one person gives orders or directions to another person who carries them out." *United States v. Stratton,* 779 F.2d 820, 827 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986). On the other hand, "an organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them in their activities in one essentially orderly operation or enterprise." 2 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 58.21 (1977). "The ordinary meaning of the word 'organizer' does not carry with it the implication that the organizer is necessarily able to control those whom he or she organizes." *Ray,* 731 F.2d at 1367; *accord Oberski,* 734 F.2d at 1032 n. 3. Although " 'cases involving well-defined chains of command under the control of a "King Pin" offer the clearest examples of organization, supervision, or management, ... the necessary showing can plainly be made in the case of a less structured enterprise.' " *Dickey,* 736 F.2d at 587 (quoting *Mannino,* 635 F.2d at 117). The defendant need not even have been the *dominant* organizer or manager of the enterprise; "the statute requires only that he occupy some managerial position" with respect to five or more persons. *United States v. Becton,* 751 F.2d 250, 255 (8th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *United States v. Losada,* 674 F.2d 167, 174 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982).

■ The defendant's relationships with the other persons need not have existed at the same time, the five persons involved need not have acted in concert at the same time or with each other, and the same type of relationship need not exist between the defendant and each of the five. *Becton,* 751 F.2d at 254–55; *Dickey,* 736 F.2d at 587; *United States v. Sinito,* 723 F.2d 1250, 1261 (6th Cir.1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984); *Mannino,* 635 F.2d at 116–17.

■ Additionally, the defendant need not have had personal contact with each of the five persons involved. *Dickey,* 736 F.2d at 587; *accord United States v. Lueth,* 807 F.2d 719, 732 (8th Cir.1986); *United States v. Rosenthal,* 793 F.2d 1214, 1226, *modified on other grounds,* 801 F.2d 378 (11th Cir.1986). Nor must each transaction with or instruction to those persons organized or managed specifically originate with the defendant. The mere delegation of managerial and supervisory duties will not defeat an individual's ultimate status as organizer, supervisor, or manager. *See Rosenthal,* 793 F.2d at 1226; *see also United States v. Cruz,* 785 F.2d 399, 407 (2d Cir.1986) ("We will not read into the statute a distinction between salaried 'employees' working directly under a 'King Pin' and 'independent contractors' or 'franchisees' who deal only with subordinates.").

Having discussed the construction and contours of section 848's "organizer, supervisor, or manager" language, we turn to the facts from which the jury could reasonably have found that Apodaca had the requisite relationship with at least five persons. We conclude that the evidence was sufficient to permit such a finding with respect to at least four individuals, in addition to Manzanares, Beckers, and Jackson.

■ Susan Harsch, Tim Richards, and Ron and Barbara Hale were all dealers who were supplied by Apodaca with methamphetamine. We agree with Apodaca that a mere buyer-seller relationship, *without more,* would be insufficient to establish that he held some managerial role with respect to these purchasers. The evidence, however, was sufficient to permit the jury to reasonably infer that Apodaca's relationship with Harsch, Richards, and the Hales went far beyond a simple buyer-seller arrangement.

First, all four were dealers—not merely "consumers"—who were supplied by Apodaca through Manzanares. At least some of the transactions were on a consignment basis. Manzanares would "front" the drugs to the dealers, and proceeds from the sales were passed back to Apodaca, minus the middlemen's shares. Second, after the supply from cook II was depleted and Apodaca had organized the production of a new supply, Harsch, Richards, and the Hales all met Manzanares in Casper, as instructed, to receive their new supply for distribution. *See Dickey*, 736 F.2d at 587 (defendant set up meeting places for transactions). Manzanares carefully controlled the supply going to these dealers, giving them a few ounces at a time. Third, Apodaca offered to pay for legal counsel in the event that Manzanares or any of his dealers were arrested. Under instructions to pass on that offer, Manzanares conveyed it to these four individuals. *See Becton*, 751 F.2d at 253–54 (defendant arranged for bail and attorneys' fees for those arrested); *United States v. Samuelson*, 697 F.2d 255, 259 (8th Cir.1983) (same), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1314, 79 L.Ed.2d 711 (1984). Fourth, while in jail Apodaca expressed his intent to "get everybody going again" when he was released. While this evidence by itself might have had little probative value, in the context of the other evidence it supports a reasonable inference of Apodaca's managerial role in the enterprise. Finally, there was evidence specific to each of these individuals regarding Apodaca's managerial position. Apodaca personally acknowledged to Harsch his position as the "head man." Debra Baker testified that Apodaca told her that "Susan" was selling *for him;* the jury could reasonably infer that he was referring to Susan Harsch. In jail, Apodaca told Randy Britt that "Barb and her husband" were selling *for him;* the jury could reasonably infer that he was referring to the Hales. With respect to Tim Richards, Manzanares testified that Richards was Harsch's partner, and that Apodaca knew him and knew that he was selling crank. Richards was also present in Apodaca's trailer when he was arrested.

Viewed as a whole, with all reasonable inferences drawn in favor of the prosecution, this evidence was sufficient to permit the jury to find beyond a reasonable doubt that Apodaca "occupied a sufficiently central role to be regarded as holding 'a posi-tion of organizer, a supervisory position, or any other position of management'" with respect to Harsch, Richards, and the Hales, in addition to Manzanares, Beckers, and Jackson. *See United States v. Lewis*, 759 F.2d 1316, 1331 (8th Cir.) (quoting 21 U.S.C. § 848(b)), *cert. denied*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985).

### III.

To establish a conviction under the continuing criminal enterprise statute, the Government must prove that the defendant committed a narcotics violation, see 21 U.S.C. § 848(b)(1), and that this violation was part of a continuing series of such violations, *see id.* § 848(b)(2). The courts generally agree that a "series" requires proof of three or more related violations. *See United States v. Rivera*, 837 F.2d 906, 915 n. 6 (10th Cir.1988) (citing *United States v. Ricks*, 776 F.2d 455, 463 n. 13 (4th Cir.1985) (listing cases), *cert. denied*, —— U.S. ——, 107 S.Ct. 650, 93 L.Ed.2d 705 (1986)). In this case, the CCE count in the indictment charged that Apodaca had committed nine narcotics violations, and that these nine violations were part of a continuing series.

Apodaca contends that the trial court committed reversible error by allowing the Government to introduce, over objection, evidence of his participation in cooks I and II. Neither cook was alleged in the indictment. The record makes clear that in determining whether Apodaca had engaged in a series of violations, the jury was permitted to consider these two uncharged offenses in addition to the offenses listed in the CCE count and the substantive offenses charged in Counts Two through Four. Apodaca argues that the indictment was thereby materially varied or constructively amended.

We recently considered similar factual circumstances in *Rivera*, and the discussion there informs our analysis here. In *Rivera*, although the CCE count itself alleged only two violations as part of a continuing series, *see* at 915, we concluded that the indictment was not invalid on its face because the three violations sufficient to comprise a series were alleged in other substantive counts of the indictment, *see id.* at

920, even though they were not listed in the CCE count. However, we reversed the CCE conviction in *Rivera* because the Government presented evidence at trial of additional violations that were not set out in the indictment at all, thereby creating the possibility that the jury convicted the defendant on grounds not charged in the indictment. *Id.* at 920–21. *Rivera* confirms that serious constitutional concerns are raised in the present case because the jury was allowed to consider cooks I and II as constituting part of the series required as an element of the CCE count.[1] *See id.* at 919–20.

The Fifth Amendment provides that a person can only be tried on charges for which a grand jury has indicted him. Accordingly, the courts have consistently held that " 'after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself.' " *United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 1819, 85 L.Ed.2d 99 (1985) (quoting *Stirone v. United States,* 361 U.S. 212, 215–16, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960)); *accord United States v. Adams,* 778 F.2d 1117, 1118–19 (5th Cir.1985); *United States v. Combs,* 762 F.2d 1343, 1346 (9th Cir.1985); *United States v. Yeo,* 739 F.2d 385, 387 (8th Cir. 1984); *United States v. Cusmano,* 659 F.2d 714, 717–19 (6th Cir.1981). An indictment is constructively amended if the evidence presented at trial, together with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the indictment. *See Stirone v. United States,* 361 U.S. 212, 215–19, 80 S.Ct. 270, 272–74, 4 L.Ed.2d 252 (1960); *compare United States v. Hathaway,* 798 F.2d 902, 910 (6th Cir.1986) (no constructive amendment when defendant indicted for acting with knowledge but jury instructed to convict even if only reckless) *with Adams,* 778 F.2d at 1123 (constructive amendment when defendant indicted for using license with a false name but possibly convicted only because of false address).

In *Stirone,* for example, the indictment charged the defendant with unlawfully ob-

structing or affecting interstate commerce by extortion and threats, in violation of the Hobbs Act, 18 U.S.C. § 1951. The affected interstate commerce was alleged to be the movement of sand interstate for the manufacture of cement. At trial, the Government was permitted to prove, and the jury was instructed, that the affected commerce was either that alleged in the indictment or the use of the concrete to construct a mill that would manufacture articles of steel to be shipped interstate. The Court held:

"Although the trial court did not permit a formal amendment of the indictment, the effect of what it did was the same. And the addition charging interference with steel exports here is neither trivial, useless, nor innocuous. While there was a variance in the sense of a variation between pleading and proof, that variation here destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury."

*Id.* 361 U.S. at 217, 80 S.Ct. at 273 (citations omitted). When a constructive amendment is established, it constitutes reversible error per se. *Id.* "Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." *Id.*

Because the doctrine of constructive amendment ensures that a defendant's jeopardy is limited to those offenses presented to and returned by a grand jury, the trial court constructively amends the indictment if it allows the Government to prove its case in a fashion that creates "a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *Hathaway,* 798 F.2d at 910. Conversely, when the admission of acts not charged in an indictment does not create such a substantial likelihood, the courts have held that the indictment had not been constructively amended. For example, no constructive amendment arises from the admission of acts not charged in the indictment when the court's instructions to the jury preclude the possibility that the defendant was convicted on those acts. *See,*

---

1. The indictment in this case listed the acts which allegedly constituted violations of 21 U.S.C. §§ 841 and 843, and then alleged, "[w]hich violations were *part of* a continuing series of violations...." Rec., vol. I, doc. 1, at 3

(emphasis added). In accordance with *Rivera,* we reject the argument that under these circumstances the evidence of uncharged violations constituted a variance. *See Rivera,* at 914–915.

*e.g., United States v. O'Connor,* 737 F.2d 814, 821–22 (9th Cir.1984); *United States v. Gonzalez,* 661 F.2d 488, 492 (5th Cir. 1981). Under the highly unusual circumstances of this case set out below, we conclude there was no possibility that Apodaca was convicted on the basis of the violations not charged in the indictment.

The CCE count alleged that Apodaca committed the following nine offenses as part of a continuing series of violations:

"1. On or about October 2, 1980, ALFRED LEE APODACA was convicted by the State of Wyoming for the crime of delivery of marijuana;

"2. On or about September 20, 1984, ALFRED LEE APODACA placed a telephone call to his Probation Officer in the State of Wyoming requesting permission for a 30 day trip to Oregon and California;

"3. From on or about September 28, 1984, through and including October 9, 1984, ALFRED LEE APODACA, GEORGE C. WILLIAMSON and NICK MANZANARES manufactured methamphetamine in Grants Pass, Oregon;

"4. On or about October 15, 1984, ALFRED LEE APODACA distributed a quantity of methamphetamine to Ronald Jackson in San Francisco, California;

"5. On or about October 27, 1984, ALFRED LEE APODACA possessed approximately 6–8 pounds of methamphetamine with the intent to distribute same in the State of Wyoming;

"6. On or about November 3, 1984, ALFRED LEE APODACA distributed a quantity of methamphetamine to Steven Teske in the State of Wyoming;

"7. On or about November 5, 1984, ALFRED LEE APODACA distributed a quantity of methamphetamine to Debbie Burke in the State of Wyoming;

"8. On or about January 18, 1985, ALFRED LEE APODACA possessed with intent to distribute a quantity of phenyl-2-propanone, a Schedule II controlled substance, at or near Grants Pass, Oregon;

"9. On or about January 18, 1985, ALFRED LEE APODACA possessed with intent to distribute a quantity of methamphetamine, a Schedule II controlled substance, at or near Grants Pass, Oregon;"

Rec., vol. I, doc. 1, at 1–3.

Apodaca's trial strategy was to put on no defense, and to virtually concede all but one of the elements of the CCE charge, arguing to the jury instead that the Government had failed to prove his management or control of five or more people, *see* Part II supra. Thus, Apodaca's counsel conceded generally in his closing argument that Apodaca had in fact committed at least three of the violations specified in the indictment. *See* rec., vol. VIII, at 688. He specifically conceded that Apodaca had been convicted in state court for delivering marijuana, *see id.* at 682, 698, that Apodaca had called his probation officer requesting permission to take the trip to Oregon, *see id.* at 683, and that Apodaca had manufactured methamphetamine in Oregon, *see id.* at 685–87. He also conceded that Apodaca had been involved in a conspiracy, arguing that the jury should convict him of that lesser included charge rather than the CCE count:

"On Count I, that is not to say that [Apodaca] is not guilty of a lesser included offense of conspiracy to violate the drug laws of the United States, but I believe that there was enough evidence to convict him of that in a New York second.

"He conspired and agreed with, and there's ample evidence, and I'm not going to kid you, and I haven't kidded you through this trial, and I haven't hung you up on stuff, because you are interested in doing justice.

"Mr. Apodaca and Manzanares organized together. There was a conspiracy, there was an agreement, as there was with Mr. Williamson—I mean, they agreed. They bought the chemicals together. They mixed it up together. Everybody had a different job, and it was an agreement to violate the drug laws of the United States, and they committed what are called overt acts in furtherance of that agreement. They manufactured the drug. They dispensed the drug, gave it away to Debbie Burk, putting it in their arms.

"Those are, in fact, overt acts in furtherance of a conspiracy to violate the

laws of the United States, and he's guilty of it. I'm not saying that. That's for you ladies and gentlemen to determine, but if there has ever been a case in which the defendant is not guilty of the crime charged in the indictment in the history of this country, this is it.

"As I said from the beginning, ladies and gentlemen, that does not make this man a person with whom any of us would care to break bread, but by the same token, he is not guilty of Count I of this indictment, and I would respectfully ask and pray that you consider the evidence carefully and listen to the instructions that His Honor will read to you, and render a verdict of not guilty on Count I, a verdict of guilty on the lesser included offense of conspiracy to violate the laws of the United States, and I believe the evidence supports a verdict of guilty on the other two counts."

*Id.* at 697–98.

The jury convicted Apodaca on Count Four of the indictment, the firearm possession count, which alleged the state court drug conviction as the underlying felony conviction. The jury also convicted him on Count Two, the use of a telephone to facilitate a felony, which rested on Apodaca's call to his probation officer. The jury thus specifically found that Apodaca in fact had committed at least two of the violations that the grand jury had charged were part

2. Count Three named Apodaca as an unindicted coconspirator in the Oregon methamphetamine cook. Unlike his coconspirators, Apodaca was not charged with this offense because it is a lesser included offense of the CCE count. As such, the circuit courts agree that it can constitute a predicate offense. *See, e.g., United States v. Fernandez,* 822 F.2d 382, 384–85 (3rd Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 450, 98 L.Ed.2d 391 (1987); *United States v. Ricks,* 802 F.2d 731, 737 (4th Cir.) (en banc) (citing cases), *cert. denied,* — U.S. —, 107 S.Ct. 650, 98 L.Ed.2d 705 (1986); *United States v. Young,* 745 F.2d 733, 750–52 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

3. We expressed concern in *Rivera* about the prejudice to a defendant when he is faced at trial with prosecution on an element of the offense on which he was given insufficient notice. *See Rivera,* at 917–918. While Apodaca claims on appeal that he was surprised by the introduction of cooks I and II, he did not object below on the basis of surprise. Moreover, the

of a series. In addition, Apodaca's attorney clearly conceded two additional federal drug felonies of which Apodaca was given notice in the indictment: manufacture of methamphetamine in Oregon, and conspiracy to manufacture methamphetamine as set out in Count Three of the indictment.[2] We are not prepared to assume that the jury found Apodaca not guilty of predicate acts conceded by his counsel. The record therefore eliminates any possibility that the jury convicted Apodaca for a series of acts not specified in the indictment. Moreover, the circumstances here do not under any view of the record " 'enable[ ] [the defendant's] conviction to rest on one point and the affirmance of the conviction to rest on another.' " *Rivera,* at 919 (quoting *Russell v. United States,* 369 U.S. 749, 766, 82 S.Ct. 1038, 1048, 8 L.Ed.2d 240 (1962)). We therefore hold that, effectively, there was no constructive amendment in this case.[3]

## IV.

Finally, Apodaca contends that the trial court abused its discretion and denied him a fair and impartial trial by permitting the marshal to secure his legs with a fifteen-inch leg chain during the trial. We disagree.

 The presumption of innocence in favor of the accused is a fundamental component of the due process right to a fair and impartial trial. *United States v.*

Government responded on appeal that Apodaca was afforded full discovery of the Government's files and had full notice pretrial of the Government's intention to prove cooks I and II. The record bears out the Government's claim, and Apodaca did not rebut this assertion in his Reply Brief.

We also expressed concern in *Rivera* that allowing the conviction to rest on evidence of acts not charged in the indictment could raise double jeopardy problems by leaving open the possibility that a defendant could be subsequently indicted on the basis of the uncharged acts. *See Rivera,* at 917. However, "[t]he entire record, not just the indictment, may be referred to in order to protect against double jeopardy if a subsequent prosecution should occur." *United States v. Boston,* 718 F.2d 1511, 1515 (10th Cir. 1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984). Because the jury was permitted to consider cooks I and II, these acts could not be used to form the basis for a subsequent continuing criminal enterprise or drug conspiracy charge.

*Hack,* 782 F.2d 862, 867 (10th Cir.), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986); *Kennedy v. Cardwell,* 487 F.2d 101, 104 & n. 4 (6th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974); *United States v. Samuel,* 431 F.2d 610, 614 (4th Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971). "It follows that [the defendant] is also entitled to the indicia of innocence." *Samuel,* 431 F.2d at 614; *see also Hack,* 782 F.2d at 867. The use of shackles or other physical restraints on a defendant is thus strongly disfavored because it undercuts the presumption of innocence. *See Hack,* 782 F.2d at 868; *Zygadlo v. Wainwright,* 720 F.2d 1221, 1223 (11th Cir.1983), *cert. denied,* 466 U.S. 941, 104 S.Ct. 1921, 80 L.Ed.2d 468 (1984).

Nevertheless, the right of a criminal defendant "to appear before the jury unfettered from physical restraints is not unqualified." *Hack,* 782 F.2d at 867. In some cases there may be "compelling reasons" that justify such physical restraints. *Id.*

> "Such a practice, however undesirable, may be considered by the trial court in exceptional circumstances where there is a substantial need to protect the safety of the court and its participants, to prevent a threatened escape, to uphold the integrity and orderly decorum of the proceeding, or to respond to any other manifest necessity. The extent to which the security measures are needed should be determined by the trial judge on a case-by-case basis by 'considering the person's record, the crime charged, his physical condition, and other available security measures.'"

*Id.* at 868 (quoting *Harrell v. Israel,* 672 F.2d 632, 638 (7th Cir.1982)).

██ The decision whether the circumstances justify the use of physical restraints "lies within the informed discretion of the trial court and will not be disturbed on appeal unless that discretion was clearly abused." *Id.* at 867. In order to permit meaningful review of the trial court's decision, the reasons for the trial judge's decision should be placed on the record. *Kennedy,* 487 F.2d at 107; *Samuel,* 431 F.2d at 615; *see also Hack,* 782 F.2d at 868 ("the record reflects the district judge carefully weighed all relevant factors"; his reasons were "sufficiently documented").

██ In the present case, we cannot say that the trial judge abused his discretion by permitting the marshal to secure Apodaca with the leg chain during his trial. The record shows that the judge considered various factors justifying the measures. First, the court was aware of other dangerous acts committed by Apodaca in the past. *See* rec., vol. V, at 98. Second, the marshal believed restraints to be "absolutely necessary." *Id.* at 96; *see Kennedy,* 487 F.2d at 104 (deputy sheriff asserted that handcuffing defendant was necessary); *Samuel,* 431 F.2d at 615 (judge may not delegate his discretion to the marshal, but "may rely heavily on the marshal's advice"). Third, Apodaca faced a possible sentence of life imprisonment without parole if convicted of engaging in a continuing criminal enterprise. This third factor is clearly insufficient by itself to justify the use of physical restraints. Nevertheless, it is relevant in connection with the information implicating Apodaca in the escape of another individual. Fourth, Apodaca had been implicated in the successful escape of another individual from federal prison. Significantly, the judge took precautions to ensure that any prejudicial effect of the physical restraint was minimized. The judge noted that "the leg iron is better than handcuffs," *id.* at 97, and ordered that Apodaca be brought into and removed from the courtroom out of the presence of the jury, to minimize visibility of the leg iron to the jury.

We conclude that under these circumstances, the trial judge did not abuse his discretion and Apodaca was not deprived of his right to a fair trial.

AFFIRMED.

## ORDER ON REHEARING

Apodaca has petitioned the court for rehearing on the constructive amendment issue decided against him by the court's opinion in this case. Because the opinion erroneously implies that the same jury that convicted Apodaca also convicted his coconspirators of Count Three, the opinion has been revised, supra, p. 430, to reflect the more accurate situation and to clarify the court's reasoning. Except for the changes made on page 430, the petition for rehearing is otherwise denied for the following reasons.

Apodaca had noticed from the indictment of the drug-related felony offenses of selling marijuana, use of a telephone to facilitate a drug offense, manufacturing methamphetamine in Oregon, and conspiring to manufacture methamphetamine in Oregon (Count Three). Contrary to his assertion in the petition, Apodaca need not have been previously convicted of the federal offense of selling marijuana in order for it to be a predicate offense for CCE purposes. *See United States v. Markowski,* 772 F.2d 358, 361 (7th Cir.1985); *United States v. Young,* 745 F.2d 733, 747 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). This holds true as well for the conspiracy underlying Count Three, which may be a predicate offense to the CCE charges. *See* supra 430 at n. 2.

We are not persuaded by the other arguments in the petition for rehearing.