896 F.2d 1368
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Danny THIEMECKE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Cynthia SHUMAN, Defendant-Appellant.
 Nos. 88-5159, 88-5160.
 United States Court of Appeals, Fourth Circuit.
 Argued: Dec. 6, 1989.
Decided: Feb. 13, 1990.
As Amended on Denial of Rehearing April 3, 1990.
 
 Lonnie Carl Simmons, J. Timothy DiPiero (Di Piero & Jackson, on brief); Thomas W. Smith, for appellants.
 Mary Stanley Feinberg, Assistant United States Attorney (Michael W. Carey, United States Attorney, on brief), for appellee.
 Before BUTZNER, Senior Circuit Judge, JAMES H. MICHAEL, Jr., United States District Judge for the Western District of Virginia, sitting by designation, and ROBERT R. MERHIGE, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 This case presents separate appeals by two defendants from the judgment following their conviction by jury of various counts in the district court. The appellate arguments are presented in joint briefs of the two defendants, Danny Thiemecke and Cynthia Shuman. For the sake of simplicity, the defendants will be referred to as "Thiemecke" and "Shuman" and together as appellants.
 
 I. Assignments of Error
 
 2
 The appellants present a multiplicity of issues challenging the convictions below.
 
 
 3
 As to Thiemecke, the assignments of error are as follows:
 
 
 4
 A. The insufficiency of the evidence to support Thiemecke's conviction for a continuing criminal enterprise (CCE) in that the government did not prove: (1) supervision of five or more persons, (2) a series of violations, (3) a felony violation of the federal narcotics law, and (4) the deriving of substantial income from the alleged drug transactions.
 
 
 5
 B. That a continuing criminal enterprise conviction cannot be upheld where it is based solely upon "historical" evidence and uncorroborated testimony of an alleged co-conspirator.
 
 
 6
 C. The insufficiency of the evidence to establish that Thiemecke engaged in a conspiracy in the Southern District of West Virginia.
 
 
 7
 D. That error was committed in refusing to allow Thiemecke to produce witnesses who were then incarcerated in a local jail.
 
 
 8
 E. That error was committed in denying Thiemecke's motion for mistrial based on "numerous misstatements of the facts and an indirect comment on his refusal to testify" committed by the government in its closing argument.
 
 
 9
 F. That error was committed in sentencing Thiemecke on the CCE count and on the conspiracy count.
 
 
 10
 G. That error was committed by the court in resentencing Thiemecke after he had filed his notice of appeal.
 
 
 11
 H. That error was committed by the court in increasing Thiemecke's sentence on the CCE count after the notice of appeal had been filed.
 
 
 12
 As to defendant Shuman, the assignments of error are as follows:
 
 
 13
 A. The court's denial of motions of both Shuman and Thiemecke for severance, "where the main government witness had a plea agreement allowing him to testify against defendant Thiemecke but not against defendant Shuman."
 
 
 14
 B. The denial of Shuman's motion for judgment of acquittal as to Count One.
 
 
 15
 C. The denial of Shuman's motion for judgment of acquittal as to Count Twenty.
 
 
 16
 D. The denial of Shuman's motion for judgment of acquittal as to Counts Three and Five.
 
 II. Statement of Facts
 
 17
 Any assessment of the propriety of the actions of the district court in this case must begin with a detailed recitation of the factual pattern presented to the jury in that court. Drawn from a detailed review of a most voluminous record, the facts may be to some extent summarized by the following statement.
 
 
 18
 The defendants are before the court following a return of a verdict of guilty on certain counts. Thus, under familiar principles, the jury verdict "must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). With that consideration in mind, some 24 witnesses testified in support of the government's case in a trial which lasted approximately one week. That testimony established the involvement of Thiemecke and Shuman, husband and wife, in a major multi-state drug distribution business, commencing in the summer of 1979 and continuing into the fall of 1987. The principal location of this business was in Chicago, the home town of Thiemecke, though the evidence clearly showed connections to Parkersburg, West Virginia, the area with which Shuman apparently was most familiar.
 
 
 19
 A key witness for the government was David Shuman, hereinafter referred to as "Jake" Shuman, who was the younger brother of defendant Cynthia Shuman. While he testified under a plea agreement, which will be discussed more fully infra, he clearly stated in his testimony that, in the summer of 1979, when he was approximately 14 years old while visiting Thiemecke and Shuman in Chicago, he helped them move 15 to 20 large garbage bags full of marijuana from one room to another, later seeing Thiemecke carry these same bags out of the apartment.
 
 
 20
 Further, a friend of Shuman, Christine Fenton, testified that Shuman travelled from Chicago frequently to visit Fenton in and near Parkersburg, West Virginia, these visits continuing into late 1987. On these visits the two of them would use marijuana and occasionally cocaine, the marijuana having been supplied by both Shuman and Fenton, while the cocaine was supplied only by Shuman. Fenton further testified that Shuman stated that the source of the cocaine was "Dan," her boyfriend.
 
 
 21
 Another government witness, Roger Wilcox, quoted Cynthia Shuman as stating that on a return trip by Thiemecke and Shuman from South America, Shuman brought two suitcases full of cocaine through customs, reporting a high degree of nervousness as she was processed through the customs entry.
 
 
 22
 Without undertaking to summarize the evidence in great detail, suffice it to say that the record is replete with testimony by various witnesses, such as James Packard and Roger Wilcox, further testimony by Chris Fenton, and others, to a continuing pattern of major drug activity from 1979 through 1987.
 
 
 23
 Further, the evidence from Jake Shuman, in particular, showed Thiemecke's possession of very sizeable sums of currency from time to time. In one instance where Jake Shuman counted the money in a laundry hamper, the total was between $110,000 and $120,000. Jake Shuman further testified to making a number of trips, some 15 to 17 in total, from Chicago to Miami, to carry varying sums of money to one Ramirez or one of his associates; the sums so transported ranged on each trip between $30,000 and $40,000. He further testified that he was not willing to transport cocaine back, but was advised that the cocaine was being sent north as Jake Shuman was being sent south with the money.
 
 
 24
 Chris Fenton testified that in 1983 she visited Shuman in Chicago (Barrington), Illinois. During her visit she saw a bedroom containing various crates and boxes, one of which was open. The open crate showed full bags of cocaine. On some of the visits of Shuman to Parkersburg during the 1983-84 period, Chris Fenton saw Shuman more than once with a gallon freezer bag containing cocaine. On occasion, Chris Fenton purchased cocaine from Shuman during 1983-86, in small amounts, usually a gram or so at a time. In part, the testimony of Chris Fenton was corroborated by Shelly Ann Fenton, her sister, particularly in relation to the 1984 time period.
 
 
 25
 Cynthia Shuman also was quoted by Roger Wilcox as making an answer to his question of whether she was a cocaine dealer as follows: "She [Shuman] told me that she was and that's where the money came from." Corroborating this testimony was Wilcox's statement that sometime during the middle part of 1984 he observed Shuman with a gallon zip-lock bag which he estimated to contain approximately one pound of cocaine.
 
 
 26
 Wilcox testified that in the spring of 1984, Shuman told him that she had approximately $140,000 to invest, and she then began making deliveries of cash to Wilcox in thousands of dollars. Shuman is quoted by Wilcox as stating that the money came "from her [Shuman's] Chicago operations." At Shuman's direction, Wilcox made a number of deposits of cash at the Wood County Bank, which deposits totalled much more than $10,000 collectively, but less than $10,000 as to each deposit, Shuman stating to Wilcox that "she [Shuman] didn't want to deposit it collectively because of the IRS forms that had to be filled out if that much cash was deposited."
 
 
 27
 Another individual, Autumn Moore, testified that Shuman provided cocaine in February 1985, when Thiemecke was present, which testimony was confirmed by that of Tim Moore. Similarly, in 1986, Chris Fenton testified that she made arrangements for her sister, Sally, to buy approximately 10 grams of cocaine from Shuman, which testimony was corroborated by Sally Fenton when she stated that she purchased approximately 10 grams of cocaine for $800 from Shuman.
 
 
 28
 In 1987, Jake Shuman was living in Chicago, at the instance of Thiemecke, relayed through Jake Shuman's brother, in a series of apartments with one Ehrlich and Thiemecke. There, Jake Shuman saw Gonzalo Ramirez visiting Thiemecke; on such visits, Jake Shuman would see some 20 to 30 packages of cocaine wrapped in some form of rubberized material, each package being approximately the size of a loaf of bread. He also observed Thiemecke and Ramirez cutting the packages open after their delivery and repackaging the cocaine in those packages into gallon freezer bags. During this time, Jake Shuman saw very large quantities of cash in stacks, which he estimated to be 8 inches to 10 inches high, with the denominations being in the 50s, the 100s, and the 20s. Thiemecke on one occasion told Jake Shuman that he was paying $500 an ounce for the cocaine, which statement was corroborated by evidence introduced of Western Union money orders to Gonzalo Ramirez. The money orders were obtained by Jake Shuman at the request of Thiemecke and paid for with money which was provided by Thiemecke.
 
 
 29
 While the record on appeal reveals additional items of the sort set out heretofore, "Sufficient unto the day is the evil thereof." Not a great deal of virtue is to be found in a continuing recitation of evidence essentially of the same nature as that set out supra. All of the above evidence, plus that not summarized, was grist for the jury's mill, and, considering the convictions and acquittals by the jury, it is apparent that that mill ground "exceeding small."
 
 III. Charges Against the Defendants
 
 30
 Thiemecke was charged in Count 1 with conspiracy to manufacture and distribute marijuana and cocaine, in the period from 1979-1988, in violation of 21 U.S.C. Sec. 846. As to this count, the jury's verdict was guilty.
 
 
 31
 He was likewise charged in Count 6 with the manufacture of more than 50 kilograms of marijuana, in the summer of 1984, in violation of 21 U.S.C. Sec. 841(a)(1); in Count 7 with possession with intent to distribute 150 pounds of marijuana, in the fall of 1984, in violation of 21 U.S.C. Sec. 841(a)(1); in Count 8 with the manufacture of marijuana, in the summer of 1985, in violation of 21 U.S.C. Sec. 841(a)(1); and in Count 17 with distribution of cocaine, on February 14, 1985, in violation of 21 U.S.C. Sec. 841(a)(1). As to these counts (6, 7, 8, and 17), the jury returned verdicts of not guilty.
 
 
 32
 The final count involving Thiemecke was Count 22, where he was charged with engaging in a continuing criminal enterprise, in the spring of 1984 through mid-April 1988, in violation of 21 U.S.C. Sec. 848. As to this count, the jury returned a verdict of guilty.
 
 
 33
 As to the defendant Shuman, she was charged in Count 1 with conspiracy to manufacture and distribute marijuana and cocaine, in the period of 1979-1988, in violation of 21 U.S.C. Sec. 846; in Count 3 with possession with intent to distribute cocaine, in 1983, in violation of 21 U.S.C. Sec. 841(a)(1); and in Count 5 with possession with intent to distribute cocaine, in 1984, in violation of 21 U.S.C. Sec. 841(a)(1). Shuman was charged in Count 16 with distribution of cocaine, in December 1984, in violation of 21 U.S.C. Sec. 841(a)(1); in Count 17 with distribution of cocaine, on February 14, 1985, in violation of 21 U.S.C. Sec. 841(a)(1); in Count 18 with distribution of cocaine, in November 1987, in violation of 21 U.S.C. Sec. 841(a)(1); in Count 19 with distribution of cocaine, Thanksgiving 1987, in violation of 21 U.S.C. Sec. 841(a)(1); in Count 20 with conspiracy to defraud the United States with respect to avoiding the filing of Currency Transaction Reports, in the spring of 1984 through the fall of 1985, in violation of 18 U.S.C. Sec. 371; and in Count 21 with perjury before the grand jury, on June 30, 1987, in violation of 18 U.S.C. Sec. 1623. As to each of the foregoing accounts, the jury returned a verdict of guilty. Shuman was also charged in Count 6 with the manufacture of more than 50 kilograms of marijuana, in the summer of 1984, in violation of 21 U.S.C. Sec. 841(a)(1); in Count 7 with possession with intent to distribute 150 pounds of marijuana, in the fall of 1984, in violation of 21 U.S.C. Sec. 841(a)(1); and in Count 8 with the manufacture of marijuana, in the summer of 1985, in violation of 21 U.S.C. Sec. 841(a)(1). As to these three counts, the jury returned verdicts of not guilty.
 
 IV. Defendant Thiemecke's Conviction
 
 34
 Implicit throughout most of the brief of Thiemecke is the argument that the convictions proceed entirely on the testimony of Jake Shuman, "uncorroborated," with no supporting evidence from which the jury could conclude beyond a reasonable doubt that Thiemecke in particular was guilty as charged. This argument is advanced as to both of the counts on which Thiemecke was convicted, namely, conspiracy to manufacture and distribute marijuana and cocaine, and engaging in a CCE. The fatal flaws in this line of argument are, first, that the credibility of Jake Shuman is a matter for the jury and it is obvious that they concluded he was credible in his evidence; and, second, contrary to the representations in the brief, there are considerable amounts of corroborative evidence throughout the factual pattern, as outlined supra. Thiemecke appears to believe that it is a requirement for CCE conviction that there be some sort of document evidencing the various elements for that offense. Obviously, such a supposition is totally without merit. The jury can accept the evidence as it is tendered and can draw from that evidence such reasonable inferences as the evidence may justify, always with the proviso that it be sufficient to convince beyond a reasonable doubt as to each of the elements of the offense.
 
 
 35
 A. Conspiracy to Manufacture and Distribute Marijuana and Cocaine
 
 
 36
 As to Count 1, relating to conspiracy to manufacture marijuana and cocaine, there certainly is firm evidence from Jake Shuman to the effect that very substantial quantities of cocaine were in the possession of Thiemecke through most of the period in question, and that evidence is further corroborated by the testimony of Chris Fenton and others about seeing very sizeable amounts of cocaine in the possession of Thiemecke. Certainly, packets of somewhat less than the size of a loaf of bread, seen under the circumstances testified to by Jake Shuman, could reasonably, and justifiably, lead the jury to accept the testimony of Jake Shuman that these packets contained cocaine, in amounts far exceeding what would be appropriate for individual use.
 
 
 37
 While it is true that as to Counts 6, 7, 8, and 17 verdicts of not guilty were returned against Thiemecke, it must be noted that the standard that the jury had to apply as to these counts was proof beyond a reasonable doubt. That they did not convict on these counts indicates more than anything else that there was not sufficient evidence on these counts to satisfy the jury beyond a reasonable doubt. Looking particularly at Count 17, for distribution of cocaine on February 14, 1985, the evidence discloses that cocaine was distributed on that date at the apartment of Shuman at a party at which Thiemecke was present. His presence there does not necessarily mean that he was making the distribution which the evidence clearly disclosed Shuman was making. This is cited only as an example, but an equal analysis could be made as to the charges laid in Counts 6, 7, and 8 involving marijuana.
 
 
 38
 The challenge to Thiemecke's conviction on Count 1 of the indictment is one which depends on a selective and very narrow interpretation of the evidence. In fact, given that this evidence must be taken in the light most favorable to the government, it is clear from the testimony of Jake Shuman, and the various elements of corroborating evidence set out supra, that Thiemecke was engaged in a conspiracy to distribute cocaine, leaving the marijuana matter out of it, over a substantial period of time. References to the statement of facts, supra, demonstrate that every element of the charge of conspiracy was set out in the evidence, and it obviously was accepted by the jury as being proof of conspiracy beyond a reasonable doubt.
 
 
 39
 B. Engaging in a Continuing Criminal Enterprise
 
 
 40
 Turning to the conviction on Count 22 for engaging in a CCE, the indictment charging this offense from the spring of 1984 to mid-April of 1988, the government must prove beyond a reasonable doubt four elements. These are (1) that the defendant supervised five or more other persons, (2) that a series of violations occurred, (3) that at least one of the violations was a felony violation of the federal narcotics law, and (4) that the defendant derived substantial income from the alleged drug transactions.
 
 
 41
 As to the first element, this court has previously held that it must be shown beyond a reasonable doubt that the defendant is "an organizer or supervisor." See United States v. Lurz, 666 F.2d 69, 76-77 (4th Cir.1981), cert. denied, 455 U.S. 1005 (1982). Thiemecke argues that because of his acquittal on charges in Counts 6, 7, 8, and 17, there is therefore no evidence of his supervision, or as an organizer, of 5 or more other persons. He argues that since no other violations are charged in the indictment except for those on which he was acquitted, the CCE conviction must fall. However, this issue has previously been dealt with in several cases, where it has been found that the failure to list every violation "comprising the continuing series of violations" does not destroy the efficacy of a Sec. 301 charge. United States v. Bergdoll, 412 F.Supp. 1308, 1318 (D.Del.1976); United States v. Sperling, 506 F.2d 1323, 1344 (2d Cir.1974), cert. denied, 420 U.S. 962 (1975). From the testimony of Jake Shuman alone, the jury could well have concluded that there was a continuing series of violations of the drug laws, actually committed in massive amounts. As indicated infra, the testimony of Jake Shuman was accepted by the jury and is corroborated by other testimony, as is set out in the factual recitation.
 
 
 42
 Again, in connection with the element of a commission of a felony in violation of the federal narcotics laws, Thiemecke relies strongly on the fact that because he was acquitted of all of the charges except conspiracy and continuing criminal enterprise, there has therefore not been shown a felony violation of the federal narcotics laws. Certainly, if Jake Shuman's evidence is accepted, as it obviously was, there was more than adequate evidence to demonstrate felony violations of the United States narcotics laws.
 
 
 43
 Beyond this point, however, is the fact that the jury did convict Thiemecke of the felony of conspiracy to violate the federal narcotics laws. It is now settled in this circuit that a conspiracy conviction under Sec. 846 may serve as a predicate offense for a CCE charge under Sec. 848. United States v. Ricks, 802 F.2d 731, 737 (4th Cir.1985) (en banc ). In this case, conspiracy is charged as a violation, and is one which resulted in conviction. This ends the argument on this point but, aside from conviction of conspiracy as a predicate offense, there was evidence which would demonstrate beyond a reasonable doubt other qualifying violations, whether they were charged as separate offenses in the indictment or not so charged.
 
 
 44
 Turning to the element of the continuing criminal enterprise offense which requires that Thiemecke have participated in a continuing series of violations, as observed in United States v. Lurz, supra, at 78, "[i]t is clear that the failure to list every violation comprising the continuing series of violations does not destroy the efficacy of a Sec. 848 charge."
 
 
 45
 As to the element of a CCE violation which requires that Thiemecke have acted in concert with five or more other persons, one again must look to the evidence in the case. With reference particularly to the evidence of Jake Shuman there are identified in that evidence Jake Shuman, Cynthia Shuman, Gonzalo Ramirez, the brother of Gonzalo Ramirez and Roger Wilcox, who assisted in transporting cocaine to Chicago and were present in Thiemecke's home in Chicago. The jury could very well have concluded beyond a reasonable doubt that each of these individuals was a participant in a CCE.
 
 
 46
 Turning to the requirement that Thiemecke serve as an organizer or supervisor of the various persons named, United States v. Mannino, 635 F.2d 110, 116 (2d Cir.1980), sets out the burden on the government: "The government's burden is only to show that the defendant organized, supervised, or managed at least five other persons." With the evidence taken most favorably for the government clearly showing that very sizeable quantities of cocaine were brought to the Thiemecke residence in Chicago over a period of time at least from 1983 to 1987, that Thiemecke displayed large amounts of cash, that Thiemecke dispatched Jake Shuman to Miami to transport money to pay for cocaine which Jake Shuman immediately thereafter saw in Chicago, all with participation in one or more of the various events by the individuals named in the evidence, all conjoin to give to the jury a reasonable basis to conclude beyond a reasonable doubt that in this instance Thiemecke was an organizer or a supervisor or a manager of at least five other persons.
 
 
 47
 The final element for the CCE violation is a showing that Thiemecke derived substantial income from drug trafficking. It scarcely needs repetition that the showing in the evidence of very substantial sums of money in the hands of Thiemecke, where he had no regular employment other than in rehabilitating old buildings, is sufficient to permit the jury to conclude beyond a reasonable doubt that Thiemecke drew substantial income from drug trafficking which the jury obviously concluded was an activity in which Thiemecke was an organizer or a manager.
 
 
 48
 The mechanistic construction given to these requirements, as shown in the joint brief of the appellants, as applied to the evidence as it is disclosed in the record, is simply not enough to lead this court to find that an error in this area was committed.
 
 
 49
 Because this court is satisfied that the five elements were proved beyond a reasonable doubt, the conviction of Thiemecke of conducting a CCE is affirmed.
 
 V. Defendant Shuman's Conviction
 
 50
 Cynthia Shuman's principal assertion of error is that the trial court committed error when it denied the motions of the appellants for severance in the trial below, asserting that where a principal government witness had a plea agreement which permitted him to testify against Thiemecke but not against Shuman, severance was mandated.
 
 
 51
 Jake Shuman is the brother of Cynthia Shuman, the defendant here. Prior to trial, Jake Shuman had entered into a plea agreement with the government, which plea agreement was standard in all respects, save that it had one provision on which Shuman bases her argument for severance. That provision stated that "[t]he United States agrees that it will not call Mr. Shuman [Jake Shuman] to testify at trial against his brother, Robert Lee Shuman, II, or his sister, Cynthia Lynn Shuman."
 
 
 52
 So far as the record discloses, Jake Shuman gave no direct evidence involving his sister, Cynthia Lynn Shuman. He did, however, testify in detail to the transactions about which he knew involving Thiemecke. It was the burden of the government to show from all of the evidence that a conspiracy existed, and Jake Shuman's testimony relating to a conspiracy, as it involved Thiemecke, was critical to the government's case. The government could, and did, take the position that as to conspiracy Jake Shuman's testimony related to Thiemecke, but that the remainder of the evidence taken as a whole placed Shuman in the conspiracy. Obviously, this was the decision of the jury, since it convicted Shuman of conspiracy to distribute cocaine. Illustrative of the care with which the jury looked at the various charges against Shuman is the fact that she was convicted on those offenses involving cocaine, perjury, and violation of currency transaction reports, but was acquitted of the three charges relating to marijuana (Counts 6, 7 and 8). As with Thiemecke's case, it is apparent that the jury did not feel that there was proof beyond a reasonable doubt which would justify conviction of Shuman on these three counts.
 
 
 53
 Joinder of defendants for trial is preferred, particularly where one of the charges is conspiracy. Contrary to the assertion of Shuman that the trial court gave implicitly illogical instructions and in general confused the jury, review of the record reveals that the court very carefully instructed the jury that no inference of any form of guilt as to Shuman could be drawn from Jake Shuman's testimony. This was repeated in the course of the trial, and was in essence reflected in the charge to the jury when it was given the case. Again, only a mechanistic application of selected case law to narrow portions of the facts can support Shuman's challenge to the action of the court in refusing severance.
 
 
 54
 Shuman's second challenge is to her conviction on Count 20 of the indictment relating to conspiracy to defraud the United States by avoiding the filing of currency transaction reports. Here, the testimony of Wilcox is critical. That testimony is to the effect that Cynthia Shuman turned over to him large sums of money to be deposited in his account in amounts less than $10,000 so as to avoid the necessity of filing the currency transaction reports. Thereafter, Wilcox dispersed the money from his account for Shuman. Shuman argues that she was not a "bank customer" but that Wilcox was. Again, the narrowness of this interpretation of the statute is obvious on its face. There is no evidence to indicate in any way that Wilcox was not the agent of Shuman in undertaking these transactions, and the Wilcox evidence clearly supports beyond a reasonable doubt the inference that the action was taken in this fashion so as to avoid having to make currency reports accounting for these very large sums of money. The only real challenge as to conviction on this point is on the basis of the conclusion that Shuman was not a "bank customer." Where one acts through an agent, the principal is responsible for the actions of that agent taken in execution of the agency.
 
 
 55
 No argument is presented by Shuman as to her conviction on the charge of perjury, so that this court does not deal with that count.
 
 
 56
 V. The District Court's Refusal to Issue Writs of Habeas
 
 Corpus ad Testificandum
 
 57
 At the close of the government's case, defense attorneys approached the bench to indicate that they had found a problem in terms of producing certain witnesses who then were incarcerated in the Kanawha County Jail. Defense counsel proffered for the record that these witnesses would testify that Jake Shuman had stated to them in the course of a card game that he would do anything he could to avoid any adverse consequences from his participation in this conspiracy. Obviously, this testimony was desired in an effort to impeach, or at least to lessen the credibility of, Jake Shuman. It developed that subpoenae for the attendance of these witnesses had been procured, but that defense counsel had not sought the usual writs of habeas corpus ad testificandum. After hearing, the court overruled the motion, indicating that it came too late, and that the court could not then issue the writs of habeas corpus ad testificandum when counsel had adequate opportunity previously to secure such writs and to have them executed.
 
 
 58
 The decision whether to issue such a writ is a matter committed to the sound discretion of the court, exercising the power to issue such writs in accordance with 28 U.S.C. Sec. 2241(C)(5). This court has dealt with this issue in United States v. Jackson, 757 F.2d 1486 (4th Cir.1985). There, the holding was as follows:
 
 
 59
 We hold that when, as here, the defendant fails to petition for this habeas relief until after the beginning of trial, the trial judge has discretion in ruling on the petition comparable to his discretion in ruling on a motion for a continuance to secure a witness during trial, for the effect and purpose of the petition is the same as the motion for a continuance. The defendant is not entitled to special consideration by the fortuity that the witness he seeks to secure is in custody. The trial court abuses its discretion in not halting proceedings to allow the defendant to secure a witness when the witness appears to be prepared to give exculpatory testimony and the defendant has made reasonable efforts to secure the witness's presence before trial. See, Shirley v. North Carolina, 528 F.2d 819, 822-23 (4th Cir.1975).
 
 
 60
 757 F.2d at 1492. Of course, that quotation precisely covers the situation in the court below in this case. Nothing in the record indicates that the testimony sought from these three potential witnesses was in any way exculpatory testimony. Rather, all indications are that the testimony of the three people would be directed solely at impeaching or lessening the credibility of Jake Shuman. Further, the defendants' efforts to secure the testimony of these witnesses was fatally deficient in that they had not sought the writs at any time before the close of the government's case. This court cannot find that the court below abused its discretion in refusing to issue the writs, to delay the trial, and to permit the matter to come on at a later time.
 
 
 61
 VI. Denial of Defendant Thiemecke's Motion for Mistrial
 
 
 62
 During closing argument by the government, at the time of his eighth objection, counsel for defendant Thiemecke moved for mistrial, based principally on the government's statement that a witness, Dennis Bixter, did not provide an explanation for the currency in Thiemecke's possession. The district court denied mistrial and this court determines that no reversible error was committed. The motion for mistrial was properly denied.
 
 
 63
 VII. Defendant Thiemecke's Judgment and Sentences
 
 
 64
 A final point remains in connection with Thiemecke's appeal. After conviction, the original judgment of conviction on the two counts was entered on September 20, 1988. On September 27, 1988, Thiemecke filed a motion to correct the sentence, arguing that Count 1 (conspiracy) is a lesser included offense of Count 22 (continuing criminal enterprise) and that the conviction on Count 1 should be vacated. On the next day, September 28, 1988, Thiemecke withdrew the motion for correction of sentence and filed a notice of appeal. In a telephone conversation between defense counsel, government counsel, and the court on September 28, 1988, defense counsel made a statement paraphrased by the district court as stating the notice of appeal was to be filed on that day "to make certain that the court is ousted of jurisdiction ... and does not have the ability to attempt to resentence or enhance or increase the sentence on my client...." At that time the court advised counsel for Thiemecke that the court intended immediately to vacate the September 20, 1988, judgment. On the next day, the original sentencing order was vacated and the court scheduled a resentencing hearing. The court below agreed that it had erred in sentencing Thiemecke separately on the conspiracy charge, since it is in fact subsumed in the CCE charge.
 
 
 65
 Even though Rule 35(a), Fed.R.Crim.P., is very precise in its language in saying "[t]he court may correct an illegal sentence at any time ...", there is apparently disagreement among the circuits as to just exactly what is meant by that language when a notice of intent to appeal has been filed. The Court of Appeals for the Fourth Circuit has not directly passed on these issues, though its decision in United States v. Ball, 734 F.2d 965 (4th Cir.1984), vacated on other grounds, 470 U.S. 856 (1985), has some bearing on the matter, concerning resentencing action to be taken if Thiemecke prevails on this challenge.
 
 
 66
 Perhaps the best discussion of the issue is to be found in Doyle v. United States, 721 F.2d 1195 (9th Cir.1983). In Doyle, the Court of Appeals had presented to it essentially the same pattern which is present in this case and found that the trial court had the authority under Rule 35(a) to correct its illegal sentence. In Doyle, the defendant had been sentenced on an armed robbery count and a firearm count, having been charged with three counts of armed robbery and two counts of carrying a firearm during the commission of a felony. These sentences were imposed some two weeks before the announcement of Busic v. United States, 446 U.S. 398 (1980), where the Court held that a defendant may not be sentenced for a firearm violation when the defendant is also sentenced for a crime of which the firearm violation is an element. In Doyle, the defendant had filed a notice of appeal immediately following the original sentence.
 
 
 67
 Following Doyle's first sentencing, his counsel moved to correct an illegal sentence under Fed.R.Crim.P. 35(a), based on the reasoning in Busic, on which motion the trial court then resentenced the defendant for armed robbery alone. In the Doyle opinion, the court discusses the "interaction" between Rule 35(a) and the general rule to the effect that the filing of a notice of appeal transfers jurisdiction from the district court to the court of appeals with respect to all matters involved in the appeal. The court's opinion goes on to say "[t]his rule is not absolute, but a creature of judicial prudence. Its purpose is to avoid the confusion and inefficiency of two courts considering the same issues simultaneously." Under the facts in Doyle, the court of appeals held squarely that the trial court retained jurisdiction to correct the sentence under Rule 35(a) while the appeal is pending. It recognized this holding as an exception to the general rule concerning transfer of jurisdiction, indicating that such exceptions are to be recognized "where they serve the general purposes of the policy against confusion and waste." The fact pattern in Doyle would seem to give to Doyle a stronger argument for his position than does the fact pattern in this case give to Thiemecke a stronger position. Here, the action of the district court was undertaken almost immediately after the original sentencing and immediately after the improper sentence had been called to the district court's attention. The Doyle logic of the conclusion concerning the "interaction" between Rule 35(a) and the transfer of jurisdiction rule is persuasive to this court. The Doyle court also indicated that a successful appeal on the point would bring about a direction from the court of appeals to do exactly what the trial court actually did, finding that upholding the jurisdiction of the trial court to do so is "consistent with the policy against confusion and waste." 721 F.2d at 1198.
 
 
 68
 There is contrary authority to be found in United States v. Mack, 466 F.2d 333 (D.C.Cir.), cert. denied, 409 U.S. 952 (1972). There, the court stated that the "general desirability of an orderly appellate process weighs against allowing a district court, absent extraordinary circumstances, to modify the judgment under consideration once an appeal has been noted." 466 F.2d at 340 (emphasis added).
 
 
 69
 In considering the language in Mack, it must first be noted that the court below in this case did not "modify" the judgment. Rather, the judgment was vacated, and a new judgment was entered. Further, the circumstances in this case present the extraordinary circumstances which were referred to in the Mack opinion. It is certain from the record that Thiemecke was on notice that the court below intended to vacate the sentence, as of the time the notice of appeal was filed. Thereafter, the district court brought the matter on for resentencing and made a long statement contained in the record concerning its view of the respective criminal responsibility of the two defendants, of their sentences, and of the court's view of the actual time which the defendants would be required to serve. The court had sentenced the two defendants to terms aggregating thirty years each, maintaining parity between them. In resentencing Thiemecke, the court calculated carefully the time Shuman would serve under her sentence on the multiple counts for which she was convicted. It then set the resentencing term of imprisonment for Thiemecke after likewise carefully calculating the time Thiemecke would serve, so as to cause the two defendants to serve approximately the same time in prison. Thus, the court sought to maintain the parity of the two sentences, as it had originally intended.
 
 
 70
 The court dealt fully with the doctrine of North Carolina v. Pearce, 395 U.S. 711 (1969), indicating that Thiemecke's conduct since the first sentencing would not justify any form of increase. The court then proceeded to impose a term of imprisonment on Thiemecke "which merely brings Mr. Thiemecke's exposure to the same amount of real time in prison and is not a sentence which increases his sentence under the law and thus follow[s] within the parameters of North Carolina v. Pearce."
 
 
 71
 In this case, the record discloses that the court very carefully undertook to give to Thiemecke "a sentence appropriate to the gravity of the offense and the character and propensities of the offender." See United States v. Busic, 639 F.2d 940, 952 (3d Cir.), cert. denied, 452 U.S. 918 (1981). It is significant in considering this matter to note that Thiemecke had not yet begun to serve the original sentence imposed, so that no double jeopardy problems are involved, and any successful effort on this point of appeal in fact would permit him to profit from the mistake made in the court below in imposing the separate sentence on the conspiracy count. In fact, in the case at bar, the appeal of the defendant on this point has as its sole purpose the prevention of the court below from correcting an acknowledged error.
 
 
 72
 Thiemecke advances the argument that the second sentence is a severer sentence, because under the first sentence Thiemecke would have been eligible for parole in 10 years, whereas under the second sentence imposed Thiemecke is not eligible for parole for approximately 18 years. From this Thiemecke argues that the district court in the second sentence clearly increased Thiemecke's real time.
 
 
 73
 Looking simply to the terms of the respective statutes under which Thiemecke was convicted to determine the time required to be served is not the end of the inquiry, however. At the time the district court imposed the second sentence on Thiemecke, it carefully reviewed the various provisions of the then-applicable statutes, together with the then-applicable regulations of the parole commission, in determining that the application of those provisions of the law indicated that under the second sentence on the CCE count Thiemecke would serve several months less than he would serve under the original sentence on the two counts. This comes about because of the statutory provisions concerning length of time to be served on various convictions and sentences, and the time under various statutory provisions when the defendant would "max out." While defense counsel did not agree with the court's conclusion, it appears that the court was correct in its analysis of the real time to be served by Thiemecke, and that the real time to be served by him is in fact somewhat less than the real time which Thiemecke would have served under the original sentence.
 
 
 74
 Because the analysis undertaken by the district court is correct and for the further reason that a review of the various statutory provisions confirms the calculations of the court below, the second sentence is, in fact, not a severer sentence than the original sentence imposed. It is true that the differences between the two sentences is a matter of months, but the months operate in favor of Thiemecke. Since this is the case, it is not necessary further to consider the doctrine of Pearce and those cases which follow Pearce.
 
 
 75
 Thiemecke moves this court for leave to "develop the record" further as to the computation of real time to be served. Considering the fact that a number of months elapsed between the vacating of the original sentence and the later proceedings after which the second sentence was imposed, the court declines to grant this request and this court affirms the decision of the district court related to defendant Thiemecke's sentence.
 
 
 76
 For the foregoing reasons, based upon the law and the evidence, this court affirms the convictions of defendants Danny Thiemecke and Cynthia Shuman and the sentence ultimately imposed on Danny Thiemecke. The decision of the district court is
 
 
 77
 AFFIRMED.