947 F.2d 942
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jonathan LOWRY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bonita Jones LOWRY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carson MAYNOR, Defendant-Appellant.
 Nos. 90-5516, 90-5518 and 90-5519.
 United States Court of Appeals, Fourth Circuit.
 Argued March 7, 1991.
Decided Oct. 25, 1991.
As Amended Nov. 25, 1991.
 
 Appeals from the United States District Court for the Eastern District of North Carolina, at Fayetteville. Malcolm J. Howard, District Judge. (CR-89-36-3)
 Argued: James R. Willis, Willis & Blackwell, Cleveland, Ohio, for appellant Jonathan Lowry; S. Mark Rabil, Bowden & Rabil, Winston-Salem, N.C., for appellant Maynor; Renny Walter Deese, Reid, Lewis, Deese & Nance, Fayetteville, N.C., for appellant Bonita Lowry; Christine Witcover Dean, Assistant United States Attorney, Raleigh, N.C., for appellee.
 On Brief: Margaret Person Currin, United States Attorney, Raleigh, N.C., for appellee.
 E.D.N.C.
 AFFIRMED.
 Before WIDENER, Circuit Judge, CHAPMAN, Senior Circuit Judge, and JOHN A. MACKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Appellants Jonathan Lowry, Bonita Lowry and Carson Maynor appeal their convictions of various drug related offenses following a jury trial in the Eastern District of North Carolina. Jonathan Lowry was convicted of all of the counts on which he was charged. This included Count 1, conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848; Count 2, conspiracy to possess with intent to distribute and to distribute marijuana and cocaine in violation of 21 U.S.C. § 846; Count 3, distribution of cocaine in violation of 21 U.S.C. § 841(a)(1); Count 4, interstate travel with the intent to promote the distribution of marijuana in violation of 21 U.S.C. § 841; and Count 5, money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).
 
 
 2
 Bonita Lowry was charged in Count 2 with conspiracy to possess with intent to distribute and distributing marijuana and cocaine and in Count 6 with use of the telephone in facilitating the possession with intent to distribute cocaine in violation of 21 U.S.C. § 843(b). She was convicted on Count 2 and was acquitted on Count 6.
 
 
 3
 Carson Maynor was convicted on Count 2 of conspiracy to possess with intent to distribute and with distribution of marijuana and cocaine. He was not charged in any of the other counts in the indictment.
 
 
 4
 Appellants challenge their convictions and their sentences. They claim error by the district court as follows:
 
 
 5
 (1) In failing to dismiss the indictment which failed to identify the five or more essential persons the grand jury relied upon in returning the continuing criminal enterprise charge against Jonathan Lowry; (2) in failing to strike the testimony of witness Brady Locklear that he had passed a polygraph test; (3) in admitting certain testimony of Special Agent W.R. Myers; (4) in admitting evidence, during the crossexamination of Jonathan Lowry's brother and codefendant Donald Lowry, that had the effect of placing Jonathan Lowry's character in evidence in violation of Federal Rule of Evidence 404; (5) in failing to instruct the jury that on the continuing criminal enterprise count it was required to reach a unanimous agreement as to the three acts which constituted the continuing series of narcotics violations committed by Jonathan Lowry in order to convict him of operating a continuing criminal enterprise; (6) in failing to require the jury to indicate which of the numerous felony offenses, as to which evidence was introduced, it relied upon in finding the continuing series element of the continuing criminal enterprise offense; (7) in failing to require the jury to agree unanimously as to the five or more persons acting in concert with Jonathan Lowry and with respect to whom he occupied a position as organizer, supervisor or other position of management, and to require unanimous agreement as to the continuing series of felony drug violations required under 28 U.S.C. § 848; (8) in finding Jonathan Lowry guilty of operating a continuing criminal enterprise when the proof did not establish that he either (A) committed the required continuing series of felony drug violations or (B) did so in concert with five other persons as mandated by 21 U.S.C. § 848; (9) in sentencing Jonathan Lowry under the Sentencing Guidelines for conspiracy and operating a continuing criminal enterprise when other defendants were acquitted and the conspiracy did not exist after November 1, 1987, the effective date of the Sentencing Guidelines; (10) in excluding appellant Maynor's expert testimony that his I.Q. was 70 and his development abilities were equal to those of a third grader; (11) in the admission of statements made by Maynor during the search of his room; (12) in failing to grant Bonita Lowry's motion for acquittal on the conspiracy count when the evidence was not sufficient to establish that she was a knowing participant in the conspiracy; (13) in the admission of testimony resulting from an alleged telephone conversation with Bonita Lowry when there was no foundation laid for the identification of Bonita Lowry; (14) in the admission of testimony that Bonita Lowry had smoked a marijuana cigarette, because this evidence of illegal conduct was not charged in the indictment.
 
 
 6
 * The indictment alleged a conspiracy beginning on or about January 1, 1981, and continuing until about March 1988, which conspiracy included Jonathan Lowry, Bonita Lowry, Carson Maynor, Donald Lowry and Hardy Wynn (all of whom were indicted), and unindicted co-conspirators: Kelly Ray Chavis, Pedro Ernesto Fominaya, Hanson Hunt, Brady Locklear, James Fuller Locklear, James Harold Maynor, David O. Mercer and others known and unknown to the grand jury. A number of the unindicted co-conspirators had, prior to trial, entered into plea agreements with the government and testified against the appellants.
 
 
 7
 The jury acquitted Donald Lowry and Hardy Wynn on the conspiracy count, but it convicted Jonathan Lowry, Bonita Lowry and Carson Maynor on this count. Bonita Lowry was acquitted on the use of a telephone in furtherance of the drug distribution as charged in Count 6.
 
 
 8
 The jury was requested to return a special verdict as to whether each defendant's involvement in the conspiracy continued past November 1, 1987, the effective date of the Sentencing Guidelines. On this inquiry the jury found that Jonathan Lowry had participated after that date, but that Bonita Lowry and Carson Maynor had not.
 
 
 9
 On the continuing criminal enterprise count, the jury was charged in part:
 
 
 10
 It must also be proved in this count that the defendant engaged in the continuing series of violations with at least five or more persons, whether or not those persons are named in the indictment and whether or not the same five or more persons participated in each of the violations, or participated at different times;
 
 
 11
 You must identify these five or more persons to yourselves and be unanimous in your selection of at least five or more persons;
 
 
 12
 And it must be proved that the defendant's relationship with the five or more persons was that of an organizer, supervisor or manager; that he was more than just a fellow worker and either organized or directed the activities of the others, whether he was the only organizer or supervisor or not.
 
 
 13
 When the verdict was returned, the jury produced a written list entitled "People Involved in the CCE" and named such persons as "Ernest Harris, Kelly Ray Chavis, Charles Smith, David Mercer, Brady Locklear, Pedro Fominaya, James E. Maynor, Carson Maynor, Bonita Jones Lowry, and Reenes Locklear (proper spelling is "Renice")." The evidence established to the satisfaction of a jury that there was a conspiracy beginning in early 1981 to buy, sell and distribute marijuana and cocaine. The dominant figure in this conspiracy was Jonathan Lowry, and the conspirators' activities centered around Lowry's residence and his body shop in Robeson County, North Carolina. A large portion of the marijuana and cocaine was obtained by Jonathan Lowry and his associates from Pedro Fominaya in Florida. Fominaya was a witness for the prosecution and testified to the sales of marijuana and cocaine to Jonathan Lowry and those associated with him. A number of the other co-conspirators entered plea agreements and testified for the government.
 
 II
 
 14
 Jonathan Lowry unsuccessfully moved to dismiss the indictment on the ground that it was defective because it did not identify the five or more persons the grand jury relied upon as being "in concert" with Lowry in operating the continuing criminal enterprise in violation of 21 U.S.C. § 848. Appellant concedes that under United States v. Amend, 791 F.2d 1120, 1125 (4th Cir.), cert. denied, 479 U.S. 930 (1986), and Hamling v. United States, 418 U.S. 87, 117 (1974), an indictment which tracks the language of the statute is sufficient to satisfy the requirements of due process. However, he argues that in a continuing criminal enterprise prosecution the circumstances are unique. Merely tracking the statute by charging that the accused committed a "continuing series" of acts without identifying the various acts relied upon as the basis for the continuing criminal enterprise charge, and tracking the statute but failing to identify the five or more persons required to meet the numerical element of the offense, does not reflect what the grand jury may have relied upon. This puts the prosecution in a position to convict on the basis of acts that were not a part of the indictment.
 
 
 15
 A second superseding indictment was returned after the appellant's motion to dismiss the prior indictment, but the continuing criminal enterprise count was the same in each indictment and the charge merely follows the language of 21 U.S.C. § 848. Appellant Lowry argues that this charge does not supply enough information to allow him to prepare his defense.
 
 
 16
 By a letter of October 18, 1989, the United States Attorney advised defense counsel of four predicate offenses that would be used to prove the "continuing series" of acts and, in the same letter, furnished the names of seven individuals as "some of the persons whom Lowry supervised." Lowry had additional information from discovery, such as all law enforcement reports, and he was provided Jencks material at the time of jury selection. He has not shown, nor even alleged, that he suffered any specific prejudice or that he was surprised by any witnesses called by the prosecution.
 
 
 17
 The charge in the indictment tracked the language of the statute, and this is sufficient under Amend and Hamling, supra, particularly where there has been no showing of prejudice. It was not error for the district court to deny the motion to dismiss the indictment.
 
 III
 
 18
 Appellants claim that the trial judge erred in failing to strike the testimony of government witness Brady Locklear, who on crossexamination stated that he had taken a polygraph test. Appellant claims that this statement had the effect of impermissibly bolstering Locklear's testimony and his credibility in the eyes of the jury. Appellant argues that this prejudicial statement was volunteered by the witness and was not responsive to any question asked of him. Counsel moved to strike Locklear's statement, but the court denied this request and in doing so stated: "counsel; you opened the door." Defense counsel and the judge then asked the witness a number of questions that clearly established that the polygraph was not in reference to his testimony being given in this case. No curative instruction was given to the jury concerning the polygraph statement.
 
 
 19
 The law is settled in the Fourth Circuit that evidence of a witness having taken a polygraph is inadmissible. United States v. Tedder, 801 F.2d 1437, 1444 (4th Cir.1986), cert. denied, 480 U.S. 938 (1987). However, on the present record we find the error to be harmless. The questioning of Locklear, after he made this objectionable comment, clearly established that the polygraph was not given in connection with the testimony he was giving against Lowry, so it would not have unduly bolstered his credibility.
 
 
 20
 While the trial judge should have sustained the objection, struck the witness' statement and given a curative instruction, we are inclined to agree with his statement to counsel that he had "opened the door." The witness was being subjected to a vigorous cross-examination about that section of his plea agreement which required him to give truthful testimony in court if called as a witness. Counsel had repeatedly asked if the agreement did not provide that the government was to be the sole judge of whether he had told the truth. It is obvious that the witness was trying to protect himself against the insinuations of counsel that he was tailoring his answers to please the government. It does not appear from the record that the witness was trying to increase his credibility so as to bolster his testimony in the eyes of the jury, but was merely trying to protect himself from the insinuations being made. Since it was clearly shown that Locklear's trial testimony was not subjected to a polygraph, we find the error harmless.
 
 IV
 
 21
 Jonathan Lowry argues that the testimony of S.B.I. Agent W.R. Myers as to three undercover drug purchases made by a confidential informant from James Harold Maynor was hearsay and, since these purchases were overt acts made in the furtherance of a conspiracy, Lowry's right to confrontation was violated.
 
 
 22
 Agent Myers testified that he initiated and was in charge of an investigation of the illegal drug activities of James Maynor, and in the course of this investigation he initiated three "controlled buys" of drugs from Maynor by a confidential informant. Two purchases were made and on the third purchase Maynor was arrested. The purchases were set up by telephone calls to Maynor. Myers testified that he personally dialed the number and then the informant conducted the conversation in his presence. Myers did not testify as to what was said in the telephone conversations, but did testify that the conversations were made to set up the drug transactions. Three of the calls were made to Jamestown Satellite Sales and one was made to Maynor's residence. A total of one and one-half pounds of cocaine was obtained in the three purchases, and as a result of these sales, James Maynor was convicted of drug offenses.
 
 
 23
 Agent Myers was not testifying as to what he had been told by a confidential informer, but he was relating what he had done and what he had seen. He was describing the actions of the informant from his personal observation. An agent who observes an informant's actions and describes them to the jury is not giving hearsay testimony but is "testifying as to a fact within his own personal experience." United States v. Gandara, 586 F.2d 1156, 1158 (7th Cir.1978); see also United States v. Kabbaby, 672 F.2d 857, 863 (11th Cir.1982).
 
 V
 
 24
 Jonathan Lowry argues that the prosecution improperly placed his character in issue in violation of Federal Rule of Evidence 404, which provides in part:
 
 
 25
 Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
 
 
 26
 (1) Character of accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same.
 
 
 27
 The reference was to Jonathan Lowry's reputation as a drug dealer, and it occurred during the government's cross-examination of Donald Lowry, the brother of Jonathan. Donald Lowry was a codefendant and had been indicted in the conspiracy count. He took the stand in his own defense and denied any involvement in any illegal drug business. He also denied knowing certain members of the alleged conspiracy, and he was acquitted by the jury. He was asked if he had stayed out of his brother's drug business and answered that he had not been in the drug business. He was then asked if he knew his brother was in the drug business, and he stated: "From hearsay." He was then asked: "Did your brother have a reputation for being a drug dealer?" He responded: "I have heard it, yes."
 
 
 28
 The district court ruled that this testimony was not admitted for the purpose of showing that Logan's conduct on a particular occasion was in conformity with such reputation but was admitted for the purpose of showing the defendant Donald Lowry's knowledge and participation in the conspiracy. Under Rule 404(b), evidence of other wrongs may be admissible to prove opportunity, intent or knowledge, and it was on this basis that the trial judge allowed Donald Lowry to be asked whether he was aware of his brother's reputation for being a drug dealer. Upon this ground and under the facts of this case, we cannot say that the trial judge abused his discretion in allowing this one question and answer.
 
 VI
 
 29
 Appellant Jonathan Lowry claims a denial of due process because the trial court refused to instruct the jury that in order to convict on the continuing criminal enterprise count they must be unanimous as to the three acts constituting the "continuing series" of narcotics violations required by 21 U.S.C. § 848, unanimous that he supervised at least five persons, and unanimous as to the identity of these persons. He argues that this is particularly important where evidence has been submitted as to more than three felony drug offenses and that the jury must be unanimous as to three specific offenses.
 
 
 30
 The trial judge gave a general unanimity charge and also charged as to the persons supervised: "You must identify these five or more persons to yourselves and be unanimous in your selection of at least five or more persons." When it returned its verdict, the jury listed the names of eleven persons who were supervised, organized or managed by Jonathan Lowry. This list of eleven persons is clearly sufficient under the statute, under the charge, and under due process to reflect unanimity on this element.
 
 
 31
 As to the specific unanimity charge on the three predicate acts, Lowry relies upon United States v. Echeverri, 854 F.2d 638, 642 (3d Cir.1988), which held that where the government has offered evidence of a plethora of drug-related activity, it was error for the trial court not to charge the jury that it must unanimously agree on which three acts constitute the continuing series of violations. The Third Circuit is alone in requiring this specificity.
 
 
 32
 We find United States v. Rosenthal, 793 F.2d 1214, 1226 (11th Cir.), modified on other grounds, 801 F.2d 378 (11th Cir.1986), cert. denied, 480 U.S. 919 (1987), and United States v. HernandezEscarsega, 886 F.2d 1560 (9th Cir.1989), cert. denied, 110 S.Ct. 3237 (1990), more persuasive. In Hernandez-Escarsega, the court held that, in ordinary cases, a general instruction of unanimity was sufficient, but if
 
 
 33
 "it appears ... that there is a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice." In such situations, the trial court must augment its general instruction to ensure that the jury understands its duty unanimously to agree to a particular set of facts. We need not decide in the instant case, however, whether such augmentation was necessary to safeguard Hernandez' rights, because we find that the facts support the conclusion that the jury unanimously agreed on three predicate offenses. Thus, any instructional error was harmless.
 
 
 34
 886 F.2d at 1572 (citations omitted) (quoting United States v. Encheverry, 719 F.2d 974, 975 (9th Cir.1983)).
 
 
 35
 The same reasoning is applicable to our facts. The jury unanimously found Jonathan Lowry guilty of Counts 3 and 4. Count 3 charged him with distribution of 167 grams of cocaine on January 25, 1985, and Count 4 charged him with interstate travel on November 26, 1985, with the intent to promote and carry on a business involving distribution of marijuana. The jury also unanimously found that Jonathan Lowry committed another offense after November 1, 1987. This involved his order of 10 kilograms of cocaine from Fominaya during the last week in December 1987 as Lowry was traveling to Melbourne, Florida, to surrender himself and begin serving a Florida sentence. It was at this time that Lowry instructed Fominaya to continue working with Lowry's brother, Donald. Fominaya testified that this cocaine was eventually delivered to Donald Lowry.
 
 
 36
 Since it is obvious from the jury's verdict that it unanimously found appellant Jonathan Lowry guilty of three predicate offenses, a specific unanimity charge on this element was not necessary.
 
 VII
 
 37
 Jonathan Lowry challenges the sufficiency of the evidence to support his CCE conviction. First, he claims that there was no proof that he managed, organized or supervised five other persons, because David Mercer, Ernest Harris, Kelly Chavis and Charles Smith were only purchasers of drugs and not employees or persons supervised, and there was no evidence to connect him with Fuller Locklear, Hanson Hunt, and John Hunt. He also claims that the record fails to support a finding that he controlled Renice Locklear, Carson Maynor, Bonita Lowry, Pedro Fominaya, James Maynor, or Brady Locklear. He asserts that drug sales to such persons for cash or on credit is not sufficient to establish a supervisory or managerial role, and he claims that the prosecution has shown nothing more than a number of buyerseller transactions or relationships and that United States v. Butler, 885 F.2d 195, 200-01 (4th Cir.1989), holds this is not sufficient under § 848, 885 F.2d at 201. While Butler does state that "the mere showing of a buyer-seller relationship, without more, is not sufficient under § 848" (emphasis added), it gives considerable guidance on this issue:
 
 
 38
 The issue of what sorts of relationships satisfy § 848's requirement that a defendant "organize, supervise, or manage" other persons involved in federal narcotics crimes has received a good deal of judicial attention. Although no simple test has been developed, a number of guiding principles have emerged. First and foremost, the terms "organize, supervise, or manage" are used disjunctively in the statute such that it is only necessary that any one of these three relationships be shown to exist between the defendant and a particular underling or associate. United States v. Apodaca, 843 F.2d 421, 426 (10th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 325, 102 L.Ed.2d 342 (1988). Further, these terms should be applied in their ordinary sense as understood by the public or the business community. See, e.g., United States v. MoyaGomez, 860 F.2d 706 (7th Cir.1988); and United States v. Wilkinson, 754 F.2d 1427 (2nd Cir.1985), cert. denied, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). "The defendant's relationships with the other persons need not have existed at the same time, the five persons involved need not have acted in concert at the same time or with each other, and the same type of relationship need not exist between the defendant and each of the five." United States v. Apodaca, 843 F.2d at 426, citing United States v. Becton, 751 F.2d 250, 254-55 (8th Cir.1984), cert. denied, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985). See also United States v. Aiello, 864 F.2d 257 (2nd Cir.1988); United States v. Rhodes, 779 F.2d 1019 (4th Cir.1985), cert. denied, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986). Nor need the defendant have personal contact with the five persons because organizational authority and responsibility may be delegated. See, e.g., United States v. Alvarez, 860 F.2d 801, 816 (7th Cir.1988) and United States v. Apodaca, supra. And while proof of a supervisory or managerial relationship requires a showing of some degree of control by the defendant over the other persons, such proof is not required to show that a defendant acted as an organizer. "[A]n organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them ... in one essentially orderly operation or enterprise." 2 E. Devitt & C. Blackmar, Federal Jury Practice & Instructions § 58.21 (1977). Finally, the mere showing of a buyer-seller relationship, without more, is not sufficient under § 848. United States v. Apodaca, supra.
 
 
 39
 885 F.2d at 200-01.
 
 
 40
 Of course, sufficiency of the evidence disputes require us to view the evidence in the light most favorable to the prosecution and decide whether the evidence is sufficient for any rational trier of fact to find proof of the essential elements of a crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 41
 While Lowry may score a point or two on his claim that he did not manage or supervise some of the persons named by the government, he cannot evade the claim that he was an organizer of this extensive illegal drug enterprise. As Butler holds, the relationship with the five persons need not exist at the same time. The conspiracy in this case is alleged to have existed over a period of seven years, and it was not claimed that Lowry was involved with all of the alleged persons during the entire time.
 
 
 42
 Lowry had an ongoing relationship with Ernest Harris that was more than a buyer-seller arrangement. Lowry dictated the price and, when Harris could not pay, Lowry demanded that Harris take him to Florida and introduce him to Harris' drug source. While in Florida, they purchased cocaine and marijuana together. Harris both used and sold drugs he obtained from Lowry, who fronted drugs to him. In exchange for drugs, Harris conveyed land to Lowry and James Maynor, who built a shopping center on some of this land. The relationship of Harris and Lowry was more than that of a buyer-seller and was sufficient in number of contacts, duration, volume of narcotics purchased and Harris' compliance with Lowry's directions to demonstrate management and supervision of Harris by Lowry. "[T]he management element is established by demonstrating that the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms." United States v. Possick, 849 F.2d 332, 336 (8th Cir.1988).
 
 
 43
 Jonathan Lowry recruited David Mercer to become a cocaine salesman shortly after Mercer had been released from prison following a counterfeiting conviction and sentence. Mercer was operating a pawn shop at the time Lowry approached him about selling cocaine to be furnished by Lowry. In his first deal with Lowry, Mercer obtained one and one-half ounces of cocaine. He was able to sell only one ounce, and Lowry repurchased the one-half ounce that had not been sold. Later Lowry furnished three and one-half ounces of cocaine to Mercer, which Mercer immediately resold. Unbeknownst to Mercer and to Lowry, Mercer had sold the cocaine to Teddy Green, an undercover police officer and Mercer was arrested. Lowry's recruiting of Mercer, selling cocaine to Mercer and buying back the unsold portion were acts of an organizer, and Mercer was properly counted as one of the necessary five persons under § 848.
 
 
 44
 The testimony of Charles Smith was sufficient to establish that he was brought into Jonathan Lowry's organization and was controlled to a certain extent by Lowry in his drug dealings. Smith had retrieved several hundred pounds of marijuana from the landfill after police had unsuccessfully attempted to destroy it by fire. He contacted James Maynor, who introduced Smith to Jonathan Lowry. Smith took the marijuana to Lowry's mobile home, and it was weighed on a scale in Lowry's living room. Lowry set the price he would pay for the marijuana and this was at a reduced rate because of the damage done by the fire. As payment for this marijuana, Lowry gave Smith cash and a small rock of cocaine. During most of this transaction, Bonita Lowry was present together with Jonathan Lowry, James Maynor and Smith. Thereafter for several months, Jonathan Lowry fronted cocaine to Smith on credit for Smith's use and resale. During this time, Lowry furnished Smith with approximately one pound of cocaine.
 
 
 45
 The testimony of Pedro Fominaya was sufficient to prove that he was brought into the organization by Jonathan Lowry and that Lowry exercised a degree of control over him. Fominaya met Lowry in Miami in late 1982 and at that time sold him approximately 200 pounds of marijuana. In the beginning of their relationship, Fominaya dealt with Lowry through one Gene Carter, but shortly thereafter they dealt directly. In the beginning, Lowry went to Florida to buy and receive delivery of drugs from Fominaya, but later he sent people to pick up the drugs for him. Thereafter, Fominaya began to travel to North Carolina, and his first sale to Lowry in North Carolina was 4,000 pounds of marijuana delivered to Lowry's mobile home. Larry paid for only a part of this load because of its poor quality.
 
 
 46
 Over time, Fominaya began to supply Lowry with cocaine in amounts of four to eight kilos at a time. Fominaya made numerous trips to North Carolina and delivered cocaine to Larry's mobile home, his body shop, and at other places designated by him. There were times when Lowry refused cocaine delivered by Fominaya because of its poor quality and times when he directed Fominaya to bring more cocaine than he wanted to buy in order that Lowry could select what he wanted.
 
 
 47
 Lowry had Fominaya pick him up and drive him to Melbourne, Florida, when he was reporting to the correctional institution to begin service of his state sentence. It was during this journey in December 1987 that Lowry directed Fominaya to deliver certain cocaine to his brother Donald Lowry.
 
 
 48
 Fominaya and Lowry worked together for approximately three years, and during this time Fominaya furnished Lowry approximately 200 kilograms of cocaine plus several thousand pounds of marijuana. After Lowry went to prison in December 1987, Fominaya got out of the drug business.
 
 
 49
 The testimony of Brady Locklear was also sufficient to show that he had been brought into the organization by Jonathan Lowry and was directed by Lowry. Locklear testified that Lowry set up the deals but that he, Locklear, took most of the risks of transportation. Lowry directed Locklear as to when and where to pick up drugs in Florida and transport them back to North Carolina.
 
 
 50
 There were also other persons directed by Jonathan Lowry and brought into the organization by him, but it is not necessary to go into the details of each of these persons, since there was ample proof of his organizing and directing at least five persons in this drug enterprise.
 
 VIII
 
 51
 It was not error for the district court to sentence Jonathan Lowry under the Sentencing Guidelines. He argues that the jury's verdicts finding him guilty of conspiracy and of conducting a continuing criminal enterprise are inconsistent with the verdicts acquitting Donald Lowry and Hardy Wynn of conspiracy and the acquittal of Bonita Lowry on the use of the telephone charge contained in Count 6. Lowry argues that collateral estoppel bars the court from finding that a conspiracy existed after November 1, 1987. His claim rests upon the assertion that the jury obviously rejected most of the testimony of Pedro Fominaya that Donald Lowry and Hardy Wynn were involved in numerous narcotics transactions with him and that he, Fominaya, claimed to have talked with Bonita Lowry by telephone on November 26, 1985, as alleged in Count 6. He also asserts that the court was estopped by the verdicts from finding that the conspiracy and the continuing criminal enterprise, if they did exist, extended past November 1, 1987, and, since the Pedro Fominaya testimony was discredited, there was no support for the finding that Jonathan Lowry was accountable for the 150 kilograms of cocaine Fominaya testified he supplied to him. Lowry argues that these critical findings are sufficiently inconsistent with the verdicts so as to bar by collateral estoppel the guilty verdicts of Jonathan Lowry. To allow Lowry's verdicts to stand, he argues, would violate the constitutional guaranty against double jeopardy.
 
 
 52
 Lowry argues that the not guilty verdicts as to Donald Lowry, Hardy Wynn, and Bonita Lowry must be regarded as a total rejection of Fominaya's testimony as to them, and as to the quantities of drugs he testified he delivered to them.
 
 
 53
 Inconsistent verdicts are not unusual. They may result from mistake or from lenity. The Supreme Court has said: "[T]he best course to take is simply to insulate jury verdicts from review on this ground." United States v. Powell, 469 U.S. 57, 69 (1984). While the jury found that Donald Lowry and Hardy Wynn were not guilty of conspiracy, it found that Jonathan Lowry, Bonita Lowry and Carson Maynor were guilty. The jury is always instructed that it may believe all of the witness' testimony, or only part of such testimony, or none of such testimony. It appears obvious that the jury applied this instruction to its determination in the present case. Inconsistent verdicts do not support a claim of collateral estoppel on the present facts.
 
 
 54
 We find no merit to Jonathan Lowry's contention that his sentence under the guidelines violates the ex post facto principle. There was testimony of Lowry's activities, which were in furtherance of the conspiracy, in the last week of December 1987 after the effective date of the Sentencing Guidelines. We have held that a defendant may be sentenced under the guidelines when a conspiracy started before the effective date of the guidelines, but ended after the effective date. United States v. Sheffer, 896 F.2d 842, 845 (4th Cir.), cert. denied, 111 S.Ct. 432 (1990). The application of the guidelines to an ongoing conspiracy, which is in existence after the effective date of the guidelines, does not violate the ex post facto clause.
 
 
 55
 There is no merit to his claim that aggregating the total amount of the drugs, which would include those prior to the Sentencing Guidelines, also violates the ex post facto clause. This issue is also answered in Sheffer. See 896 F.2d at 845.
 
 
 56
 We find that there was substantial evidence to support the sentencing judge's finding that Jonathan Lowry's offense involved at least 250 kilograms of cocaine and 7500 pounds of marijuana. Many of the prosecution witnesses testified as to the weight of the drugs and the many sales, payments and deliveries during the course of the conspiracy. We find no merit to appellant's claim that the sentencing court applied the wrong version of the guidelines.
 
 
 57
 We find no error in the sentencing court's two level increase upon its finding that Jonathan Lowry threatened and intimidated Brady Locklear in September 1988. There is a preponderance of evidence supporting the court's finding on this point. Likewise, we find no error in the sentencing court's consideration of Lowry's prior conviction in calculating his criminal history score nor do we find error in the court's sentence, which is within the guidelines.
 
 IX
 
 58
 Appellant Maynor claims error by the district court in not allowing him to present an expert witness to testify as to his low intelligence quotient (I.Q.). The government objected to this testimony because Maynor had not complied with the notice requirements of Federal Rule of Criminal Procedure 12.2(b). Maynor argues that he gave the government actual notice when he filed his motion for severance which indicated that it was possible that his defense would be antagonistic to that of his codefendants because he might present evidence of a low I.Q. We find no abuse of discretion in the court's refusal to permit this testimony.
 
 
 59
 Maynor also contends that the government should have taken steps to have him mentally examined. Such an examination would have been possible if he had given proper notice under Rule 12(b), but such notice was not given. An examination pursuant to 18 U.S.C. § 4241 would be possible only if the government had some basis to believe that Maynor was incompetent. The government was aware that he had previously gone to trial on state charges without raising a defense of incompetency or mental defect. Maynor did not comply with the rule, and he has not shown that the government had any reason to have him mentally examined.
 
 X
 
 60
 Appellant Maynor claims error by the trial court in admitting certain statements made by him at the time of a search of his room by law enforcement officers on January 25, 1985. Maynor claims that, at the time the statements were made, he was in custody and had not been advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), nor had he waived his rights. These statements include answers given by Maynor to questions of police officers and some statements that he volunteered or made which were not in answer to specific questions.
 
 
 61
 At trial, the court conducted a voir dire hearing as to the admissibility of these answers and statements. After a full hearing, including argument of counsel, the court found that the statements and answers were admissible under Berkemer v. McCarty, 468 U.S. 420 (1984), because the defendant had not been taken into custody at the time the police asked routine questions to which Maynor was not obligated to answer.
 
 
 62
 We find no error in this ruling.
 
 
 63
 Maynor also claims error in the admission of his statements because they were not produced prior to trial in response to his motion made under Federal Rule of Criminal Procedure 16(a)(1)(A). It appears from the record that the government produced certain evidence prior to trial but did not produce a complete copy of the SBI report concerning the search of Maynor's room. It produced a three page report of the search and what was found, but this report did not include statements or answers made by Maynor during the search. This issue was covered in the voir dire hearing as to the admissibility of the statements. At this time, a copy of the statements was produced. It also appears that defense counsel was aware that Maynor had made certain statements at the time of the search because of the testimony given by police officers during Maynor's state prosecution.
 
 
 64
 Under Federal Rule of Criminal Procedure 16(d)(2), the court has the power to sanction parties who do not comply with Rule 16. One of the sanctions is to deny admissibility of the material. We find no abuse of the court's discretion in failing to deny admissibility of Maynor's statements under the facts in this case.
 
 XI
 
 65
 Bonita Lowry attacks the sufficiency of the evidence to support her conviction of conspiracy. When we review a challenge to the sufficiency of evidence, we must view the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80 (1942). We must then decide whether any rational trier of fact could have found the essential elements of the crime had been proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 66
 Mrs. Lowry argues that because she was acquitted on the telephone count, evidence of her alleged telephone conversation with Pedro Fominaya, which is the subject of that count, may not be considered in deciding whether there was sufficient evidence on the conspiracy count. She attempts to make a collateral estoppel argument, but this doctrine does not apply. Collateral estoppel prevents facts "necessarily determined in the defendant's favor" from being relitigated in a later prosecution against the same defendant. United States v. Head, 697 F.2d 1200, 1208 (4th Cir.1982), cert. denied, 462 U.S. 1132 (1983). The conspiracy charge and the telephone charge against Bonita Lowry were made in a single indictment and tried together in a single trial.
 
 
 67
 Appellant's reliance on United States v. Powell, 469 U.S. 57 (1984), is misplaced. Powell cuts against her position. Powell was charged with various drug offenses including conspiracy to possess cocaine with intent to distribute, possession with intent to distribute, and several counts of using the telephone to facilitate the conspiracy and the possession. She was acquitted of the conspiracy and possession counts, but convicted on some of the telephone counts. Powell claimed that she had been acquitted on the predicate offenses of conspiracy and possession, and therefore she could not be guilty of facilitating the crimes of which she had been acquitted. The Court found that the verdicts were inconsistent, which may have resulted from mistake, compromise or lenity, and stated:
 
 
 68
 [R]espondent's argument that an acquittal on a predicate offense necessitates a finding of insufficient evidence on a compound felony count simply misunderstands the nature of the inconsistent verdict problem. Whether presented as an insufficient evidence argument, or as an argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense, the argument necessarily assumes that the acquittal on the predicate offense was proper--the one the jury "really meant." This, of course, is not necessarily correct; all we know is that the verdicts are inconsistent. The Government could just as easily--and erroneously--argue that since the jury convicted on the compound offense the evidence on the predicate offense must have been sufficient. The problem is that the same jury reached inconsistent results; once that is established principles of collateral estoppel--which are predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict--are no longer useful.
 
 
 69
 469 U.S. at 68.
 
 
 70
 The testimony of Fominaya as to his telephone conversation with appellant Bonita Lowry may be considered in weighing the sufficiency of the evidence to convict her on the conspiracy count. We find no merit to her claim that the testimony of Fominaya as to his telephone conversation with her in November 1985 was erroneously admitted because an insufficient foundation was laid for its admission. The testimony reflects that Fominaya had many contacts with Bonita Lowry. They had visited in one another's homes, and he was clearly in a position to be able to testify that he recognized her voice and that he was talking by telephone with her. Federal Rule of Evidence 901 sets forth the requirement of authentication or identification as a condition precedent to admissibility and provides that the condition of admissibility is satisfied by, among other things, "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Fed.R.Evid. 901(b)(5). Appellant could argue to the jury that Fominaya was not familiar with her voice, but this would go to credibility and weight and not to admissibility. See United States v. Kandiel, 865 F.2d 967, 974 (8th Cir.1989).
 
 
 71
 "For the purposes of appellate review, only slight evidence is necessary to connect a person with a conspiracy." United States v. Nicholson, 525 F.2d 1233, 1237 (5th Cir.), cert. denied, 429 U.S. 837 (1976). This slight evidence rule has been refined in United States v. Alvarez, 548 F.2d 542 (5th Cir.1977). The Alvarez court stated:
 
 
 72
 Mature reflection has convinced us, however, that the "slight evidence" rule is of doubtful application to the state of facts presented here, where the issue for review is whether Alvarez was connected with the demonstrated conspiracy at all. It being of the nature of a conspiracy to conceal itself, the "slight evidence" rule finds its proper application where persons are clearly connected to the conspiring group or are found acting in such a manner as unmistakably to forward its purposes. In such instances, given the clandestine character of such projects, slight additional evidence suffices to base an inference that one who had been shown beyond a reasonable doubt to be a participant was as well a knowing participant. But where, as here, the question is whether a defendant was connected with the conspiracy at all, to apply such a rule is to risk convicting him of the crime itself upon "slight evidence." We conclude that Alvarez' presence at the river must be established by evidence which a jury could conclude rules out any reasonable hypothesis of innocence. Holland v. United States, 348 U.S. 121, 139-40, 75 S.Ct. 127, 99 L.Ed. 150 (1955). Once presence is so established, as to his knowing participation, the "slight evidence" rule may have its day.
 
 
 73
 548 F.2d at 544 (emphasis in original).
 
 
 74
 Conspiracy to distribute and possess with intent to distribute requires proof that Bonita Lowry "knew the conspiracy's purpose and took some action indicating her participation." United States v. Crockett, 813 F.2d 1310, 1316 (4th Cir.), cert. denied, 484 U.S. 834 (1987).
 
 
 75
 There is an abundance of evidence to establish that Bonita Lowry knew of the conspiracy and was closely connected with it and to those conducting it. She lived with her husband, who was the kingpin of the conspiracy, in their jointly owned mobile home. This home was used for the purchase and sale of drugs. Charles Smith testified that Mrs. Lowry was present in the home when he delivered several hundred pounds of marijuana, that she was in and out of the room while he and Jonathan Lowry were discussing the price and weighing the drug. There was testimony of Renice Locklear that Mrs. Lowry had smoked marijuana in her presence, so she must have recognized the plant when she saw it in her living room, and she obviously had possession of enough marijuana to make one joint. She had accompanied her husband and Brady Locklear to Florida and met with Pedro Fominaya, visited in his home, cruised on his boat and had her picture taken with him in a Miami restaurant. She worked for her husband and James Maynor at Jamestown Enterprises and there was testimony that numerous drug sales took place at this location. When Pedro Fominaya came to North Carolina on a drug related visit, she and her husband met him at the airport and took him to their home. She was aware that Fominaya would not spend the night at their home because of concern resulting from his having been searched by law enforcement officers at the airport when he arrived. Pedro Fominaya testified that he had delivered large quantities of drugs to Jonathan Lowry at his trailer on at least five and possibly as many as ten occasions, and that he was paid in cash for these drugs at the time of delivery. He also testified to drug deliveries at Jonathan Lowry's auto repair shop which was directly across the street from the trailer. Fominaya testified that he had met Bonita Lowry on 15 or 20 occasions and that he had brought a diamond ring from Florida to North Carolina for Jonathan to give to Bonita. He had also visited in their new brick home which they had built and moved into after they left the mobile home. There was also the testimony of Fominaya that he had telephone conversations with Bonita Lowry in November 1985 at which time he sought the whereabouts of Jonathan. Bonita gave him a telephone number in Florida, but when he could not reach Jonathan he called back and advised her that his (Fominaya) boys had already left to make a drug delivery in Jacksonville, and Bonita said she would so advise Jonathan. Although Bonita Lowry claims that this telephone conversation was not admissible and may not be considered in determining the sufficiency of the evidence to sustain her conviction, we find that it is admissible and the fact that she was acquitted on the telephone count goes to the weight given this testimony and not its admissibility.
 
 
 76
 When Jonathan Lowry was arrested in Florida, he had Bonita's suitcase, identified by her name tag attached to it. She was aware that he had this luggage with him on this particular trip, although she remained in North Carolina. At the time of Jonathan Lowry's arrest, this suitcase contained $280,000 in cash.
 
 
 77
 We find that the evidence was sufficient to raise an inference that Bonita Lowry was not only aware of the drug conspiracy, but that she actively participated in it to further its purposes. United States v. Sisca, 503 F.2d 1337 (2d Cir.), cert. denied, 419 U.S. 1008 (1974), is instructive on this point:
 
 
 78
 The government does not rely on Hoke's mere presence at the premises where contraband was found, as in Kearse; nor was his involvement as limited as that of the chauffeur of a drug dealer in Stewart. Hoke was the owner, and shared with his wife exclusive possession, of a house found strewn with narcotics and various other paraphernalia of a heroin trafficking operation. This, coupled with his presence on the premises while others entered and left carrying containers of heroin, clearly permitted the inference that Hoke performed the critical role of maintaining the "stash" or "safe haven" for the distribution operation.
 
 
 79
 503 F.2d at 1343.
 
 
 80
 Bonita Lowry was married to and lived with Jonathan Lowry, first in the mobile home and then in their brick house. She worked for him at Jamestown Enterprises and at his drag strip. She traveled with him to Florida and had met and been entertained by Pedro Fominaya, her husband's primary source of marijuana and cocaine. Fominaya testified that he had met Bonita Lowry 15 or 20 times on his trips to North Carolina and that the only reason for any of his trips to North Carolina was to deliver drugs purchased by Jonathan Lowry and to discuss the drug business. These drug deliveries were often made at Bonita Lowry's home. Mrs. Lowry knew that on one trip from Florida to North Carolina, Fominaya was searched by law enforcement officers before he boarded the plane in Florida and after he disembarked in North Carolina, and that he would not stay at her home on that trip because of concern for further action by the police. In November 1985, Bonita Lowry told Fominaya that she would pass the word to her husband that Fominaya's men had left Miami to deliver drugs to him in Jacksonville. Bonita Lowry was also in the home and often in the room when Charles Smith delivered several hundred pounds of marijuana and Smith and Jonathan Lowry discussed and agreed upon a price for this delivery.
 
 
 81
 We find no merit to Bonita Lowry's claim that the district court committed prejudicial error in allowing Renice Locklear to testify that Bonita Lowry had smoked a marijuana cigarette in her presence. We find that this is not a violation of the prohibition of bringing in evidence of an uncharged offense and that the evidence was relevant to proving Bonita Lowry's knowledge of and participation in the conspiracy and her possession of marijuana at a time when large quantities of these drugs were being delivered and bargained for in her home.
 
 
 82
 For the foregoing reasons, we affirm all convictions and sentences.
 
 
 83
 AFFIRMED.